No. 79,424

In the Matter of ADA VANDERBLOMEN.

(956 P.2d 1320)

Opinion filed April 17, 1998.

*Kenneth M. Carpenter,* of Carpenter, Chartered, of Topeka, argued the cause and was on the brief for appellant Ada Vanderblomen.

No appearance by appellee.

The opinion of the court was delivered by

LARSON, J.: This appeal involves the constitutionality of a provision of the Care and Treatment Act for Mentally Ill Persons, K.S.A. 1997 Supp. 59-2945 *et seq.*, which prevents those persons suffering from certain disorders from being subject to involuntary commitment. The court-appointed guardian for Ada Vanderblomen appeals the trial court's determination that K.S.A. 1997 Supp. 59-2946(f)(1) is constitutional and Vanderblomen's ordered discharge from a mental hospital.

In 1977, Vanderblomen was involved in a motor vehicle accident and suffered a traumatic closed head injury. Partially paralyzed and unable to care for her basic needs, she had been placed in various nursing homes.

On March 8, 1995, Vanderblomen's guardian applied to the Shawnee County District Court for a determination that Vanderblomen was mentally ill. The application alleged that Vanderblo-

men had become unmanageable at her nursing home and had injured staff, destroyed property, and become a danger to herself and other residents.

Attached to the petition was the affidavit of Dr. Benintendi, who had examined Vanderblomen and reviewed her records. The affidavit noted a history of aggression and stated Vanderblomen did not respond to questioning and was aphasic. Dr. Benintendi's diagnosis stated: "Mental Dis. NOS due to head injury or other possible organic Dis." Under treatment expectations, Dr. Benintendi wrote: "Please check for organic basis to behavior disruptions. Also evaluate medications." Dr. Benintendi concluded: "I believe client to be a danger to herself and others, and incompetent to make her own treatment decisions due to her mental illness."

The court granted a petition for temporary protective custody and appointed an attorney to represent Vanderblomen in the proceedings. On March 10, 1995, after a hearing, the court ruled there were reasonable grounds to believe Vanderblomen was mentally ill and likely to injure herself or others if not detained. The court ordered her placed in protective custody at the Topeka State Hospital.

Shortly after her commitment, Dr. Jose Bulatao at Topeka State Hospital evaluated Vanderblomen and reported to the court that Vanderblomen had not shown any aggression since her transfer, but stated she had a severe mental illness diagnosed as organic mental disorder and had no capacity to make a rational decision regarding her needs for treatment.

After receiving the report, the court concluded Vanderblomen was a mentally ill person as defined by statute and ordered her continued hospitalization. Subsequent reports from staff psychiatrists at the hospital indicated that Vanderblomen's diagnosis was organic mental disorder, characterized by impaired cognitive functioning, poor impulse control, impaired memory, impaired judgment, and unpredictable and aggressive behaviors. The reports indicated she required continued nursing care and supervision on a daily basis and she had no capacity to make rational decisions regarding treatment. Continued hospitalization was recommended.

Upon each scheduled review, the court continued to order Vanderblomen's confinement at the hospital. The next review was scheduled for June 14, 1996. The summary of Vanderblomen's medical status submitted to the court on May 24, 1996, stated she met the diagnostic criteria of dementia due to multiple etiologies and also carried the additional diagnosis of encephalopathy with aphasia. Although noting that she had shown some improvement, the report emphasized that Vanderblomen continued to be a danger to herself and others and was unable to meet her basic needs.

On June 10, 1996, the court terminated Vanderblomen's commitment, finding she was "not a 'mentally ill person subject to involuntary commitment for care and treatment.'" The court noted that she suffered from conditions described as dementia and encephalopathy, which are both descriptive of an organic mental disorder. The court stated that the new law, as provided in K.S.A. 1997 Supp. 59-2946(f)(1) excludes those suffering from an organic mental disorder from being subject to involuntary commitment.

The guardian petitioned the court to vacate the order and requested an evidentiary hearing. He pointed out that organic mental disorder had been eliminated as a separate and distinct mental disorder in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV) and argued that the new law was unconstitutionally vague.

The court denied the petition to vacate. The guardian appealed, and the Court of Appeals remanded the case to the district court to allow the guardian to present evidence in an evidentiary hearing.

At the hearing, the guardian presented the testimony of psychiatrist Dr. Samuel Bradshaw regarding diagnoses in the DSM-IV. Dr. Bradshaw stated that many prior diagnoses have been recently found to have a brain-based etiology and the wording of the DSM-IV indicates it is "illusory to say one kind of disorder is brain based and not another since the major mental disorders are all brain based." Quoting from the DSM-IV, he said: "The term organic mental disorder is no longer used in DSM-IV because it incorrectly implies [that] nonorganic mental disorders do not have a biological basis." Dr. Bradshaw agreed that usage of the term organic mental

disorder is no longer a medically acceptable diagnosis. The court took judicial notice of the entire DSM-IV.

The guardian argued that the Kansas Legislature had placed guardians in the untenable position where they have no authority to hospitalize wards needing hospitalization if those wards happen to suffer from an organic mental disorder. Vanderblomen's appointed attorney stated he had been unable to consult with his client due to her condition and he did not object to any of the guardian's remarks.

The court held the legislature clearly intended to exclude persons suffering from an organic mental disorder from involuntary commitment and decided the commitment statute was constitutional. The court found that the legislature defines legal terminology and was not persuaded that a change in the American Psychiatric Association's definitions in the DSM-IV caused the statute to become vague.

The guardian timely appeals. The Court of Appeals granted a stay of the trial court's order, and we granted the guardian's request for transfer to this court pursuant to K.S.A. 20-3017.

The issue in this case involves statutory interpretation, which is a question of law over which we have unlimited review. *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 1, 930 P.2d 1366 (1997). We are duty bound to avoid a vague construction of a statute if reasonably possible, *In re Care & Treatment of Hay*, 263 Kan. 822, 833, 953 P.2d 666 (1998). We have also stated:

"A statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down. This court not only has the authority, but also has the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute." *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, Syl. ¶ 2, 930 P.2d 1 (1996), *cert. denied* 520 U.S. 1229 (1997).

The guardian challenges the constitutionality of K.S.A. 1997 Supp. 59-2946(f)(1), which reads, in relevant part, as follows:

"(f)(1) 'Mentally ill person subject to involuntary commitment for care and treatment' means a mentally ill person, as defined in subsection (e), who also lacks

capacity to make an informed decision concerning treatment, is likely to cause harm to self or others, and whose diagnosis is not solely one of the following mental disorders: Alcohol or chemical substance abuse; antisocial personality disorder; mental retardation; organic personality syndrome; or an organic mental disorder."

K.S.A. 1997 Supp. 59-2946(e) states:

" 'Mentally ill person' means any person who is suffering from a mental disorder which is manifested by a clinically significant behavioral or psychological syndrome or pattern and associated with either a painful symptom or an impairment in one or more important areas of functioning, and involving substantial behavioral, psychological or biological dysfunction, to the extent that the person is in need of treatment."

The Care and Treatment Act for Mentally Ill Persons was enacted in 1996, repealing the Treatment Act for Mentally Ill Persons, K.S.A. 59-2901 *et seq.*

The new statutes distinguish between a "mentally ill person" and a "mentally ill person subject to involuntary commitment for care and treatment." K.S.A. 1997 Supp. 59-2946(e) and (f). The predecessor statute to K.S.A. 1997 Supp. 59-2946(f), K.S.A. 59-2902(h), made no such distinction and defined a mentally ill person as follows:

"(h) 'Mentally ill person' means any person who:
(1) Is suffering from a severe mental disorder to the extent that such person is in need of treatment;
(2) lacks capacity to make an informed decision concerning treatment; and
(3) is likely to cause harm to self or others."

When construing a statute, courts should give words in common usage their natural and ordinary meaning. "Technical words and phrases, and other words and phrases that have acquired a peculiar and appropriate meaning in law, shall be construed according to their peculiar and appropriate meanings." *Galindo v. City of Coffeyville,* 256 Kan. 455, Syl. ¶ 5, 885 P.2d 1246 (1994) (citing K.S.A. 1993 Supp. 77-201 *Second*). In *Reed v. Kansas Racing Comm'n,* 253 Kan. 602, Syl. ¶ 5, 860 P.2d 684 (1993), we also stated: "A statute is not invalid for vagueness or uncertainty where it uses words with commonly understood meanings. The test for vagueness is a common-sense determination of fundamental fairness."

The guardian argues that K.S.A. 1997 Supp. 59-2946(f)(1) uses a specific psychiatric term of art, implicating the use of DSM-IV definitions, and that this terminology cannot be considered a word in common usage. As the DSM-IV has abandoned the use of the term "organic mental disorder," the guardian claims that the term no longer has any meaning, particularly as there was testimony that the major mental disorders are all brain based.

The DSM-IV itself, however, recognizes its own diagnostic limitations in stating:

"Moreover, although this manual provides a classification of mental disorders, it must be admitted that no definition adequately specifies precise boundaries for the concept of 'mental disorder.' The concept of mental disorder, like many other concepts in medicine and science, lacks a consistent operational definition that covers all situations. . . . [D]ifferent situations call for different definitions." DSM-IV, p. xxi.

We do not believe there is any reason to link the constitutionality of a statute to the changing tides of psychiatric thought as reflected in the most recent version of the DSM. Due to the purpose of the manual and the frequent revisions it undergoes, it would be foolhardy to allow its altered provisions to render otherwise valid and comprehensible legislation unconstitutional. This point was emphasized by the United States Supreme Court in *Jones v. United States*, 463 U.S. 354, 364-65 n. 13, 77 L. Ed. 2d 694, 103 S. Ct. 3043 (1983):

"We do not agree with the suggestion that Congress' power to legislate in this area depends on the research conducted by the psychiatric community. We have recognized repeatedly the 'uncertainty of diagnosis in this field and the tentativeness of professional judgment. The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment . . . .' [Citations omitted.] The lesson we have drawn is not that government may not act in the face of this uncertainty, but rather that courts should pay particular deference to reasonable legislative judgments."

Furthermore, it is not at all clear that the legislature failed to consider the DSM-IV when it enacted the wording of 59-2946 in 1996. The general comment to the revised act submitted to the legislature by the Care and Treatment Advisory Committee of the

Judicial Council explained the rationale for the changes suggested in 59-2946(f) as follows:

"(2) 'Mentally ill person,' found currently at 59-2902(h) is rewritten and is separate from the new term 'mentally ill person subject to involuntary commitment for care and treatment.' The changes require that there are certain mentally ill persons who should not be subject to involuntary proceedings to restrict their liberty.

"(3) 'Mentally ill person subject to involuntary commitment for care and treatment' has been added. The intent is to separate the criteria that must be met before a person who is suffering from a mental illness may be involuntarily forced to accept treatment. In the current definition of 'severe mental disorder,' found at 59-2902(o), conditions caused by the use of chemical substances and antisocial personality are excluded from the legal definition. The committee expanded upon that list by naming disorders defined in the *Diagnostic and Statistical Manual of Mental Disorders* (Fourth Edition) American Psychiatric Association (1994) ('DSM-IV') which are generally professionally recognized as unresponsive to psychiatric treatment."

Although the distinction between organic and nonorganic mental disorders may no longer be clinically supported because all mental disorders may have a brain-based component, the legislature has the right to make distinctions based upon the treatability of a condition. The trial court recognized such a distinction when it stated:

"The Legislature's action is entirely consistent with this Court's prior rulings concerning the difference between 'illness' and 'organic deterioration,' *i.e.*, absence of brain cells or death of part of the brain. The legislative action in question has done no more than codify the existing law. It has been plain that the purpose for confining people involuntarily for treatment was to apply 'treatment' (whatever that might be) to change the person's mental condition. It has been stated over and over again in testimony before this Court that an 'organic' condition is not one that can be changed. It is 'organic' because part of the 'organ' is missing—destroyed, etc. It is not repairable, replaceable, or subject to change for the better. This is in contrast to changes that can be effected in a person through counseling, medication, etc. in such things as depression, schizophrenia, and the like."

Based on the legislative history, the trial court's analysis appears to be correct. In his testimony before the Senate Judiciary Committee on January 18, 1996, Judge Sam Bruner, Chair of the Care and Treatment Advisory Committee of the Judicial Council, explained the bill would amend the existing definition of "mental

illness" by making a distinction between a "mentally ill person" and a "mentally ill person subject to involuntary commitment for care and treatment." Judge Bruner stated that certain mental conditions had been added that cannot be used for involuntary commitments. The minutes of the Committee specifically state:

"The conferee stated that certain mental conditions have been added that can not be used for involuntary commitments. The conferee continued by stating that **SB 469** is an expansion over current Kansas law to prohibit involuntary commitment for the treatment of mental illness, for instances with regard to mentally retarded individuals, or with regard to alzheimer victims, etc. The conferee noted that the language immediately preceding that change in the statute, line 29 states, 'whose diagnoses is not solely one of the following.' " Minutes of Senate Committee on Judiciary, January 19, 1996.

The diagnosis in issue here is "organic mental disorder," which the testimony of Judge Bruner clearly shows was to be one of those diagnoses which will not justify an involuntary commitment. Despite the DSM-IV's abandonment of the term "organic mental disorder," the legislature clearly intended to use the term as it has been previously and commonly used throughout the psychiatric community. In the context of an involuntary commitment proceeding, disorders that have traditionally been labelled organic in nature should continue to be regarded as falling within the definition of "organic mental disorder."

We hold K.S.A. 1997 Supp. 59-2946(f)(1) is not unconstitutionally void for vagueness. We affirm the trial court.