84,652

STATE OF KANSAS, *Appellee*, v. MARK SCHWARM, *Appellant*.

(21 P.3d 990)

Opinion filed April 20, 2001.

*Stephen M. Joseph, of* Joseph & Hollander, P.A., of Wichita, argued the cause and was on the brief for appellant.

*JoAnna L. Derfelt*, special prosecutor, argued the cause, and *Timothy J. Chambers*, county attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the Court was delivered by:

WAHL, S.J.: A jury convicted Dr. Mark Schwarm, a licensed veterinarian, of 10 counts of distributing an anabolic steroid "other than for a medical purpose" in violation of the Kansas Uniform Controlled Substances Act (USCA), K.S.A. 65-4101 *et seq.*

Schwarm had been a duly licensed veterinarian since 1976, practicing in the City of South Hutchinson. Schwarm and his partner operated Associated Veterinary Services. Schwarm was the only practitioner licensed to dispense controlled substances in their practice of veterinary medicine. Winstrol-V is an injectable form of stanologzol, an anabolic steroid. Because of their potential for

human abuse, anabolic steroids are classified as Schedule III controlled drugs. See K.S.A. 65-4109(f).

Jack Cooper raised coon dogs for show competition and sport. He used Schwarm when his dogs needed veterinary services. Cooper testified that between 1996 and 1998, Schwarm saw between 30 to 40 of his coon dogs and diagnosed the dogs as having "coon dog paralysis," a debilitating disease of the nervous system. Cooper stated that Schwarm was treating about 80 of his dogs with Winstrol-V for the disease and he told Cooper the dogs were being treated on a "herd basis." Cooper would call the veterinary office for the amount of Winstrol-V he needed and pick it up. Cooper or his handlers injected the dogs on a weekly basis.

There was testimony that between April 1996 and April 1998, Upjohn Pharmaceuticals sold 555 bottles of Winstrol-V to veterinarians in the state of Kansas. During this time, Schwarm sold 332 bottles to Cooper. Although medical practitioners can dispense controlled substances, it is illegal for a practitioner to dispense a controlled substance for "other than a medical purpose." K.S.A. 65-4123(d). The State charged Schwarm with 10 counts of unlawful distribution of a controlled substance. Schwarm stipulated that Winstrol-V was sold to Cooper and that he was responsible for all sales of the Winstrol-V. The issue at trial was whether the Winstrol-V was dispensed for other than a medical purpose.

Veterinarian Brett Jones was employed at Associated Veterinary Services from March to December of 1996. In the summer or fall of 1996, Dr. Jones became concerned about the large volume of Winstrol-V being dispensed to Cooper when he could find no evidence that the dogs had been seen in the clinic. He approached Schwarm and told him he believed the volume of Winstrol-V could not be needed, was inappropriate, and should stop before they were in trouble. Schwarm reportedly agreed that dispensing the Winstrol-V to Cooper had gotten out of hand and that he would not sell Cooper any more Winstrol-V unless Cooper brought in a dog and there was a need. Dr. Jones quit his employment with the clinic in part because the sales of Winstrol-V were not discontinued even after a second conversation with Schwarm.

Denise Stewart was a receptionist at Associated Veterinary Services. She testified that she saw Cooper bring dogs to the clinic only once, and that time he brought one or two dogs. After that visit, Schwarm told her to charge Cooper for eight blood tests, though only two were drawn. According to Stewart, Cooper determined how much Winstrol-V he needed and Schwarm would ensure that there was enough on hand. Cooper never wanted a receipt for the Winstrol-V he purchased. She testified that on one occasion the Winstrol-V sale was not entered into the computer.

Tami Decker, the office manager for Associated Veterinary Services, testified that during the time period in question, she saw Cooper bring 12 to 15 dogs to the clinic. Cooper told her that he used the Winstrol-V to improve the dogs' performance in trials and working. Decker testified that some sales of Winstrol-V were not entered into the computer. Specifically, she stated that Schwarm would ask her to subtract sales of Winstrol-V from the book or instruct her not to enter a sale.

Dr. Robert Vasey provided veterinary services to 45 to 50 of Cooper's coon dogs prior to Cooper's association with Schwarm. Dr. Vasey testified that he thought it was appropriate to treat dogs with anabolic steroids and he would give vials to Cooper to treat his dogs before it was designated a controlled substance. Dr. Vasey testified he stopped giving vials of anabolic steroids to Cooper when he thought Cooper might be using it himself. Dr. Vasey testified that he would not have dispensed any steroid to Cooper without having first examined the dog being treated. Dr. Vasey acknowledged the medical uses for Winstrol-V as stated on the insert accompanying the vials, but he stated that in order to have a medical purpose in dispensing the substance the veterinarian should see the dog.

The excessive sales of Winstrol-V first came to light when Stewart, the receptionist, reported the sales to Howard Shipley, a detective with the Drug Enforcement Unit of the Reno County Sheriff's Department, in 1996. Detective Shipley referred the information to other agencies. In the fall of 1997, Schwarm called Shipley stating he wanted to do something about the large volume

of Winstrol-V that Cooper was buying from him, questioning whether Cooper was redistributing the controlled substance, whether it was illegal, and what he could do to end it. Shipley told Schwarm that he believed it was illegal and that Schwarm should discontinue the practice unless he was cooperating with law enforcement. Schwarm stated that he wanted to cooperate and Shipley advised him to contact him prior to any future purchases of Winstrol-V by Cooper. Schwarm did not contact Shipley again until April 1998, but the sales of Winstrol-V to Cooper continued.

Schwarm testified that Cooper told him he had 65 to 70 dogs. Schwarm stated that he dispensed Winstrol-V to Cooper for use with debilitated dogs and not to treat coon dog paralysis. He discussed with Cooper that dogs that become debilitated or stressed from competition and travel and not maintaining appetite would recover more quickly with Winstrol-V. Cooper supplied Schwarm with a list of 63 dogs and he was to inform the clinic for which particular dog he was picking up the Winstrol-V. Schwarm testified that he believed he was distributing the Winstrol-V to Cooper for a medical purpose.

Two experts testified on medical purpose in the veterinary field. Dr. Michael D. Apley is an assistant professor of beef production medicine at Iowa State University College of Veterinary Medicine. In addition to a doctorate of veterinary medicine, Dr. Apley holds a doctorate in physiology emphasizing clinical pharmacology and is board certified in veterinary clinical pharmacology. Dr. Apley stressed that in his opinion a physical examination of a dog was required before use of Winstrol-V. If Winstrol-V was indicated, a 4-to 8-week regimen should be established with only the necessary amount of Winstrol-V dispensed, and with scheduled follow-up to assess the progress of the dog. In Dr. Apley's opinion, a medical purpose in the veterinary community would hinge around the establishment of a valid "veterinary-client-patient relationship." Dr. Apley testified that there were three components of a veterinary-client-patient relationship. First, the veterinarian must take responsibility for determining the medical condition of the animal, if treatment is needed, and, if the owner agrees; second, the vet-

erinarian is familiar with the environment the animal is in; and third, the veterinarian is available for follow-up. Apley testified that other factors to be considered were the diagnosis and that adequate records are maintained. In Dr. Apley's opinion, coon dog paralysis should be diagnosed only by ruling out other diseases. Winstrol-V might be appropriate for a dog with coon dog paralysis, if the dog was wasting, to stimulate appetite; however, Winstrol-V is not a preventative for the disease. Dr. Apley testified that a schedule III drug should never be used in herd treatment. He testified that if an animal has not been examined, a medical purpose cannot exist for dispensing Winstrol-V for that animal. Based on the records available on Cooper's dogs, Dr. Apley testified, in his opinion, there was no medical purpose indicated for dispensing Winstrol-V.

The second expert was Dr. Dan Upson, who taught pharmacology at Kansas State University. He holds both a doctorate in veterinary medicine and in physiology and pharmacology. In describing medical purpose, Dr. Upson stated a veterinarian goes through a common sense procedure when dealing with a person's animal. He testified that what is important is the product. When the product, or drug, is a controlled substance, the procedures should be more restrictive. The animal should be examined, a history obtained, and, if appropriate, lab tests performed to establish a diagnosis. Dr. Upson testified that a veterinarian would decide what treatment was appropriate and, if using a pharmaceutical product, he would establish a need and what the product would accomplish for the animal. Finally, the veterinarian would be available for follow-up. Dr. Upson testified there was no medical purpose for long term use of Winstrol-V. He testified in no way would a herd concept apply in this case. According to Dr. Upson, assuming a dog would need only two or three injections of Winstrol-V, there was enough Winstrol-V dispensed to Cooper to treat 3,000 to 5,000 dogs.

Schwarm's veterinary expert testified that in his practice he would examine an animal before dispensing Winstrol-V.

The jury convicted Schwarm on all counts. After the trial, different defense counsel moved the trial court for judgment of ac-

quittal on Count Ten for being outside the statute of limitations. The court granted the motion. Schwarm's other convictions were severity level 3 on the drug grid with a criminal history of I, a border box. The sentencing court imposed the presumptive sentence but granted probation with 30 days in the county jail as a condition of probation and fined Schwarm $5,000.

Schwarm contends the trial court abdicated its duty to decide questions of law by not defining "medical purpose" and erred in allowing the experts to define "medical purpose." He argues the experts' definition was wrong and that their testimony that a veterinary-client-patient relationship was indispensable in determining whether a medical purpose exists contradicted legislative purpose, misled the jury, and denied him his only defense.

"A controlled substance shall not be distributed or dispensed other than for a medical purpose." K.S.A. 65-4123(d). The Kansas UCSA does not define "medical purpose."

By a very circuitous process, Schwarm concludes that underlying the concept of medical purpose is the concept of medical treatment and the intent is that medical purpose and medical treatment should have their ordinarily understood meaning.

For the ordinary meaning of "other than for a medical purpose," Schwarm refers to *Sloman v. Board of Pharmacy Examiners*, 440 N.W.2d 609 (Iowa 1989), and *People v. Terry*, 720 P.2d 125 (Colo. 1986). He also cites *Commonwealth v. Comins*, 371 Mass. 222, 356 N.E.2d 241 (1976), for its standard to which a physician should be held in dispensing or prescribing a controlled substance.

*Sloman* involves the discipline of a pharmacist for excessive sales of narcotic cough preparations. The trial court reversed the board's discipline finding the phrase "lawful purpose" and "medical purpose" unconstitutionally vague. The Iowa statute in question provided that a controlled substance included in Schedule V shall not be distributed or dispensed "other than for a medical purpose." Though *Sloman* is a civil case, the Iowa court referred to the vagueness test applied to the phrase "medical purpose" in the context of criminal proceedings. Those cases found the phrase fairly ascertainable and the court adopted the following description from

*Terry,* 720 P.2d at 127: "Distribution or dispensing of a controlled substance is 'other than for a medical purpose' when it is not made in good faith in the course of preventing, alleviating, or curing a disease or malady." *Sloman,* 440 N.W.2d at 612.

In *Comins,* an osteopathic physician was convicted of dispensing controlled substances in violation of Massachusetts law. The Massachusetts court stated:

"A physician who issues a prescription not intending to treat a patient's condition in the usual course of his practice of medicine does not issue a valid prescription, and he thus violates § 32. Such a physician violates § 32 because he acts in bad faith, in the sense that his purpose is not to treat the patient in accord with accepted medical practice. Although the physician's failure to comply with accepted medical practice is an element of the crime and evidence is admissible that the physician failed to adhere to accepted medical practice, mere malpractice in the prescribing of drugs has not been made a crime. To prove the crime, the physician's purpose, his state of mind, must be shown to have been such that he was not intending to achieve a legitimate medical objective." 371 Mass. at 232.

The Massachusetts court found the evidence that the physician took no medical history or physical examination before dispensing controlled substances supported an inference that he did not have medical needs in mind when he issued the prescriptions. Furthermore, the court found it was within the trial court's discretion to permit another osteopathic physician to give his opinion that it was not consistent with accepted medical practice to prescribe drugs without a history or examination. 371 Mass. at 232-34.

Schwarm repeatedly acknowledges that the term "other than for a medical purpose" must be given its logical and ordinary meaning. Ordinary words in a statute are to be given their ordinary meaning. *In re Vanderblomen,* 264 Kan. 676, 680, 956 P.2d 1320 (1998). Being licensed by the State Board of Veterinary Examiners requires compliance with the registration requirements of the Kansas UCSA. See K.S.A. 65-4117(b)(6). It is logical to look to the usual course of professional practice in the veterinary field to determine what constitutes a medical purpose. The phrase "other than for a medical purpose" imposes liability only when the veterinarian prescribes outside the bounds of the professional practice. The standard is not one of negligence or malpractice. The burden of proof

requires evidence that the veterinarian (1) distributed or dispensed the controlled substance, (2) that he did so knowingly and intentionally, and (3) that he did so for other than a legitimate medical purpose. See *State v. Naramore,* 25 Kan. App. 2d 302, 313-14, 322-23, 965 P.2d 211, *rev. denied* 266 Kan. 1114 (1998); *United States v. Hayes,* 595 F.2d 258, 259 n.2 (5th Cir. 1979).

The only Kansas case referring to the phrase "medical purpose" is *State v. Vakas,* 242 Kan. 103, 744 P.2d 812 (1987). In *Vakas,* the State appealed the district court's dismissal of charges against a physician for unlawful distribution of controlled substances in violation of the Kansas UCSA, mainly because of the addition of the word "legitimate" to the phrase "medical purpose" in the charging document. The physician argued that the rule of strict construction of criminal statutes compelled an interpretation of K.S.A. 65-4123(d) and the language "other than for a medical purpose" to mean that if a prescription was written for a medical purpose then no crime has been committed. This seems to be the argument Schwarm is making here. According to the physician in *Vakas,* by using the phrase "legitimate medical purpose" when the statute requires only "medical purpose," it reduced the burden of the prosecution and improperly stated the elements of the crime. Though not specifically defining "medical purpose," this court concluded "[i]n our view, the medical purpose referred to in the statute can only mean a legitimate medical purpose." 242 Kan. at 107.

Though Schwarm and the State frame this as an issue of first impression, this court, in essence, has already stated that "medical purpose" means "legitimate medical purpose" or good faith on the part of the practitioner in dispensing or prescribing a drug within the usual course of the practitioner's professional practice for a diagnosed, therapeutic purpose.

Schwarm contends that a fair reading of the experts' testimony was that a veterinary-client-patient relationship is an indispensable element of medical purpose. The experts did discuss a Schwarm's deviation from standard veterinary practice in terms of such a relationship; however, this was not the focus of their testimony. Dr. Apley calculated that if a large dog was injected with the standard dosage of 1cc of Winstrol-V per week, there were 9,996 doses from

the 332 bottles sold to Cooper. He testified that before a veterinarian dispensed Winstrol-V, the veterinarian should physically examine the dog. Then, if a need for Winstrol-V was found, only the necessary amount of the drug would be dispensed for the regimen, with follow-up scheduled to assess the progress of the dog. A treatment regimen with Winstrol-V should last only from 4 to 8 weeks according to Dr. Apley.

Dr. Upson testified that when dispensing a pharmaceutical product, a veterinarian would establish a need for the drug by physically examining the animal. He testified there could be no medical purpose for long-term use of Winstrol-V. Assuming a dog should receive only two to three injections, Dr. Upson calculated Schwarm dispensed enough Winstrol-V to treat 3,000 to 5,000 dogs.

Dispensing a drug for a therapeutic purpose assumes a doctor-patient relationship. Evidence that a drug was dispensed without a physical examination of the person or animal to be treated is evidence of whether there was good faith on the part of the medical professional or a legitimate medical purpose. Whether the experts discuss this evidence in terms of a definition of veterinary-client-patient relationship is quite irrelevant. Though the experts and prosecution emphasized the lack of a veterinary-client-patient relationship, there was other evidence to support the inference that Schwarm dispensed the Winstrol-V in bad faith.

Schwarm objected to questioning of Dr. Apley and Dr. Upson based on improper foundation. He argues that the objection was that the prosecutor had not laid foundational proof that the standards of the veterinary community produced the same definition as intended by the legislature. Schwarm's formulation of the basis of his objection is a bit far fetched. Nevertheless, even if an objection based on foundation or form of the question includes his argument here, he fails to articulate any abuse of discretion in the admission of the experts' testimony.

"The basis for the admission of expert testimony is necessity, arising out of the particular circumstances of the case. Where the normal experience and qualifications of lay persons serving as jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are inadmissible. Two requirements must be present before expert testimony is admissible at

trial. First, the testimony must be helpful to the jury. Second, before expert scientific opinion may be received into evidence at trial, the basis of that opinion must be shown to be generally acceptable within the expert's particular scientific field." *State v. Hodges,* 239 Kan. 63, Syl. ¶ 1, 716 P.2d 563 (1986).

The admissibility of expert testimony lies within the sound discretion of the trial court and its determination will not be reversed on appeal absent a showing of an abuse of discretion. *State v. Stukey,* 242 Kan. 204, Syl. ¶ 1, 747 P.2d 137 (1987).

In *United States v. Jamieson,* 806 F.2d 949, 951 (10th Cir. 1986), the court stated: " 'Expert medical testimony is, of course, admissible when it bears on the question of whether a doctor in prescribing a controlled substance is acting for a legitimate medical purpose.' *United States v. Bartee,* 479 F.2d 484 (10th Cir. 1973)." The 10th Circuit Court of Appeals acknowledged that expert testimony was not always essential when facts and circumstances surrounding the issuance of a controlled substance can support a finding of legitimate medical purpose. 806 F.2d at 951.

In *United States v. Varma,* 691 F.2d 460 (10th Cir. 1982), a physician was convicted of four counts of dispensing controlled substances without a legitimate medical reason in violation of 21 U.S.C. § 841(a)(1). The physician in *Varma* admitted to knowingly prescribing controlled substances but denied he prescribed the drugs without a legitimate medical purpose. On an issue of sufficiency of the evidence, the defendant contended the expert testimony was admitted without proper foundation, based on the qualifications of the physician expert. The 10th Circuit found no abuse of discretion in admitting the expert testimony. The court noted the trial court was careful to make sure the expert was qualified to give an opinion. The expert testified that in his opinion there was no medical indication for prescribing the drugs in question, and outlined the required physical examination that should have taken place before the particular drug should be prescribed. 691 F.2d at 463.

The question of whether Schwarm had a legitimate medical purpose in dispensing Winstrol-V to Cooper was a question of fact for the jury to decide. See *Sloman,* 440 N.W.2d at 612. The experts' opinion testimony was relevant to prove the requisite mental state

of Schwarm since Schwarm claims he dispensed the Winstrol-V in good faith for a medical purpose. The trial court did not abuse its discretion.

Schwarm argues it was clearly erroneous when the trial court failed to define "medical purpose" for the jury. This argument is curious at best. Schwarm did not request such an instruction. He argues in his brief that the term "medical purpose" should be given its ordinary meaning. We have agreed that it should be given its ordinary meaning. The trial court did not err in not defining the term.

There was sufficient evidence to convince the jury beyond a reasonable doubt that Schwarm dispensed the Winstrol-V other than for a medical purpose. There was evidence that he dispensed large quantities of Winstrol-V which was excessive for the number of dogs he examined and would be excessive for all the dogs Cooper owned even if he were legitimately treating the dogs on a herd or kennel basis. Schwarm's actions in asking that Winstrol-V sales be removed from the books or not recorded in the books and charging for more blood tests than were performed created an inference that he was not acting in good faith. There was inconsistent testimony on the number of dogs examined, the number of dogs treated with the drug, and the purpose of the treatment. Schwarm admitted the impropriety of the sales to Detective Shipley, but continued selling the drug to Cooper even after the detective told him the sales were illegal.

Schwarm's tactic at trial was that he had a medical purpose in dispensing Winstrol-V because it was dispensed with a medical treatment in mind, *i.e.*, he was treating debilitated coon dogs, which is a recognized use of Winstrol-V according to its package inserts. However, Schwarm also acknowledges that the purported medical treatment of the dogs required that it be done in good faith. The real issue here was whether he had a good faith reason or a legitimate therapeutic purpose for dispensing the Winstrol-V. This was a factual issue for the jury, and the trial court did not err in admitting the experts' testimony, nor did the trial court err in not further defining "medical purpose" for the jury.

Affirmed.

DAVIS, J., not participating.

RICHARD W. WAHL, Senior Judge, assigned.