IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,103

STATE OF KANSAS,
*Appellee*,

v.

QUINCY R.T. CARTER,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under both the United States Constitution and Kansas statutory law, a criminal defendant enjoys the right to a public trial.

2.

The right to a public trial implies that doors to the courtroom be kept open and that the public, or such portion of the public as may be appropriately accommodated, be admitted, subject to the authority of the court to exclude objectionable characters.

3.

The right to a public trial right extends to jury selection.

4.

A courtroom may be closed in the constitutional sense without an express judicial order.

5.

When a constitutional question presents mixed questions of fact and law, Kansas appellate courts give deference to trial court factual findings that are supported by substantial evidence.

6.

K.S.A. 60-404 requires a contemporaneous objection to the admission of evidence in order to obtain appellate review.

7.

A pretrial objection alone is not timely for purposes of K.S.A. 60-404 because an in limine ruling is subject to change as the case goes forward.

8.

The admission of expert testimony lies within the discretion of the district court and will not be reversed without a showing that the court abused its discretion.

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed December 18, 2020. Affirmed.

*Richard Ney*, of Ney, Adams & Miller, of Wichita, argued the cause, and was on the briefs for appellant.

*Lesley A. Isherwood,* assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.:  Quincy R.T. Carter appeals from his convictions for two counts of first-degree murder, two counts of criminal discharge of a firearm, and one count of criminal possession of a firearm.

The relationships, including gang affiliations, of the principal parties in the events leading up to the violence that generated the convictions and appeal in this case are set out in a companion appeal, *State v. Carter*, 311 Kan. 783, 466 P.3d 1180 (2020). In that appeal, this court affirmed the conviction of Brent J. Carter of felony murder arising out of the same shootings that underlie the present appeal. We summarize here the facts necessary to understand the issues on appeal.

On the day of the confrontation, December 1, 2015, Luerene Browning, and her cousin, Tatyana Crowe, were at the home of Browning's mother, Betty Holloman. Browning's sisters, Sharmethiea and Crystal, and her stepfather, John Collins, were also at the home that day.

That afternoon, Magic Jamerson and Brenton Oliver visited Browning and Crowe at the home. Jamion Wimbley drove to the house that afternoon to drop off Khalah Beard, who was a friend of Browning and Crowe's. When Wimbley pulled up, Crystal was outside in the driveway smoking and talking on the phone. Crystal ended her conversation so that she could talk with Wimbley. While the two were talking, Oliver ran out of the residence over to Wimbley's car, shouting and cursing.

The two engaged in a confrontational discussion, and Wimbley appeared frightened. As described in *Carter*, 311 Kan. at 785, one or two weeks before that confrontation, the two had been in a fight, and the confrontation in the driveway

seemed to be carrying forward the issues from the earlier physical altercation. As the argument in the driveway continued, Jamerson ran out of the house toward Wimbley's car and shouted, "On Bloods." Wimbley told Oliver he had something for Oliver's "bitch ass," and drove off, saying he would be back. Crystal became angry and warned Jamerson and Oliver not to do their "gangbanging shit" at her mother's house.

Approximately 45 minutes after Wimbley left, Jamerson and Beard got into an argument, and Beard called her sister, Alexis Davis, to come and pick her up. Alexis' boyfriend, Jonathan Carter, drove Davis to the house to pick up Beard. When they got there, Davis got out of the car so that Beard could get in the backseat. Jamerson had followed Beard out to the car, calling her names, and he and Davis proceeded to get into an argument. At the same time, Oliver and Jonathan were "tussling" near the open driver's side door of Jonathan's car. Holloman had left the house and gone over to the car to tell everyone to leave. Jonathan asked her to go back in the house so she would not be caught up in the fighting.

Those two separate fights were taking place as Wimbley returned to the house in his car. Just as he pulled up, one of the back windows in his car went down and someone stuck a gun out the window. Shots were fired from the gun. Then Brent Carter jumped out of the front passenger seat with a large gun and fired shots in the direction of the residence. Wimbley jumped out of the driver's seat and ran to where Jonathan and Oliver were fighting. Quincy Carter, whom witnesses identified as the individual who fired the shots through the backseat window, got out of the car and started shooting toward the house and the people outside. Brent then said to Carter, "Come on 'Q,' let's roll."

Oliver and Holloman died from gunshot wounds. An extensive search was conducted, and law enforcement arrested Carter about two weeks after the shootings.

The State charged Carter with two counts of first-degree murder, two counts of criminal discharge of a firearm, and a single count of criminal possession of a firearm. A jury found him guilty on all charges. The court sentenced him to two consecutive hard 25 life sentences plus 53 months. He took a timely appeal to this court.

Carter asserts five grounds for reversing his convictions. We find none of them compelling.

PUBLIC TRIAL

Under both the United States Constitution and Kansas statutory law, a criminal defendant enjoys the right to a public trial. See U.S. Const., amend. 6; K.S.A. 2019 Supp. 22-3420(d). That right implies that courtrooms be kept open and that the public, or such portion of the public as may be conveniently accommodated, be admitted, subject to the authority of the court to exclude objectionable characters. *State v. Galloway*, 311 Kan. 238, 250, 459 P.3d 195 (2020). This right to a public trial extends to jury selection. *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899, 1906, 198 L. Ed. 2d 420 (2017); *Presley v. Georgia*, 558 U.S. 209, 213, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010).

On Monday, December 11, 2017, during the voir dire of prospective jurors, most or all of the seats in the courtroom were occupied by the jury venire. As a consequence,

5

access to the proceeding was not available to the public, including Carter's and the victims' families. No one objected at the time.

While this appeal was pending, Carter filed a motion to remand the case to the trial court to determine whether the voir dire proceedings took place in closed court. Carter requested, and this court granted, a stay of briefing until the trial court made findings of fact resolving that question. The trial court then held an evidentiary hearing, at the conclusion of which it determined that the voir dire proceedings took place in open court because, in spite of the court's invitation to make some sort of accommodation that would allow the public to observe, no one requested leave from the court to sit in on the proceedings.

On appeal, Carter contends that the proceedings were, in fact, closed to his family members and he further contends that not providing space for spectators violated his Sixth Amendment right to a public trial, which necessarily requires reversal. Carter asserts two positions:  the trial court erred in its determination that the jury selection proceeding was held in open court; and, because it was not an open proceeding, reversal is required as a matter of law.

The trial court based its findings following the remand hearing on the testimony and arguments presented at the hearing. We therefore apply a bifurcated standard of review. First, without reweighing the evidence, we examine the trial court's findings of fact to determine whether they are supported by substantial competent evidence. We next apply a de novo standard of review to the ultimate legal conclusion. We do not reweigh evidence, assess witness credibility, or resolve conflicting evidence. See, e.g., *State v. Betancourt*, 301 Kan. 282, 290, 342 P.3d 916 (2015). The ultimate legal conclusion regarding whether a defendant's right to a public trial under the Sixth Amendment of the

6

United States Constitution was violated is a question of law over which an appellate court has unlimited review. *State v. Reed*, 302 Kan. 227, 236, 352 P.3d 530 (2015).

On the Friday before the trial began, the trial judge discussed various practical matters of the trial procedure with counsel for both parties. The following dialogue took place:

"MR. MUTH [Prosecutor]: Just so I understand, the courtroom is going to be full with potential jurors so no family members for either side. There won't be room for them. Where should we direct the decedents' family?

"THE COURT:  I want to emphasize that, of course, this is a public proceeding and family members particularly but the public generally, of course, is more than welcome. The problem is while we have a big courtroom, one of the bigger ones in the building, it's not big enough for the panel that we're going to need and so I don't think there's going to be room for family. But if there is, I can work with the parties to try to meet everybody's needs.

"It would not be, I'm sure, full of family members from each side. I would like, I believe, the two victims' families and certainly Mr. Carter's family representatives or persons to have the opportunity, but I don't know how that's going to work. I'll work with you all to get them in here during jury selection. It's just going to be very limited, if at all.

"So I don't know where to tell you to direct your people. I don't know if Judge Burgess or any of the other judges on this floor have jury trials. Apparently Judge Burgess does. I would say I'll work with you as best I can. If you both will talk to me when you know on Monday who's here and maybe identify one or two out of the group that might be able to fit in here, but just know they may not be able to fit. I'll do my best."

On the fourth day of the trial, the State again raised the subject of whether the proceeding was open. The following conversation took place outside the presence of the jury:

"THE COURT: We're going to make a record regarding the public.

"MR. MUTH: Judge, throughout this entire trial it's been open to the public. I think at one point when we were doing jury selection and everything else, every seat was taken by potential jurors and actual jurors. I think based on the courtroom policy there was no standing allowed by any of the spectators.

"I know there was a comment made about, hey, can we let the family in at one point and that was because we were waiting to get seats available for everybody. But I just want to make sure that the record was clear that it's been an open trial throughout the entire process. The only time that individuals were not allowed in is when there were no seats available for them. So if misstate that or anything else, counsel, Mr. Leon, or yourself can correct me.

"THE COURT: Mr. Leon, do you have any comments on that or position or statements?

"MR. LEON [Defense Counsel]: Your Honor, it's my understanding as counsel, and with discussion with both the Court and the counsel with the State, this has never been a closed proceeding. So I understand the concern of the State, but the truth this has never been a closed proceeding.

"THE COURT: All right. I appreciate that and that's of course is not just my policy, but that is the law. So we have done—it has been an open trial. We did have some limitations, just space limitations, for jury selection."

The subject of the open courtroom did not come up again until the evidentiary hearing on remand. Several witnesses, including defense counsel, David Leon; Carter's girlfriend, Lotasha Cooksey; Carter's older sister, Lashawnda Carter; Carter's older sister, Sharlita Carter; and Carter's older sister, Tanika Carter, testified that a guard informed them that the judge did not want any members of the public in the courtroom during voir dire. The family members testified the guard told them they were not allowed in because they might intimidate the jurors.

Leon testified that there were empty chairs in the courtroom during voir dire. Lashawnda Carter testified that she saw five members of the victims' families sitting in the courtroom after she had been told that she could not go in.

Alice Osburn, who was cocounsel for the prosecution, testified the trial judge never ordered the courtroom closed. She further testified that the victims' family members were not present in the courtroom during voir dire. She was acquainted with the family members, and they either were texting her about the trial or they were potential witnesses and were sequestered from the proceedings. She testified there were no empty seats in the courtroom.

A significant point in Osburn's testimony was that jury selection did not begin until after two in the afternoon. The witnesses who testified they were not allowed in the courtroom all said they left the courtroom area in the morning because they understood they would not be allowed in the courtroom. There were no witnesses who stated they attempted to enter the courtroom the afternoon that voir dire began.

9

Following deliberation, the trial judge made these findings:

> "My ruling is as follows: This trial court did not close the courtroom in any way, shape or form. At all times during the jury selection and every aspect of the jury trial the courtroom door stood open to the public. This trial was a constitutionally protected public trial."

The judge referred to the testimony and to his own memory of the voir dire to find that there were no empty seats. He stated that he would have worked with the parties to provide a means for the public to be present during voir dire if either of the parties had requested such accommodation, but no one brought it up as an issue despite his direct inquiry on the subject. He gave little weight to the testimony that a guard had turned family members away because the guard was never identified and because the alleged closing took place in the morning before any voir dire proceedings had begun. His conclusion was that voir dire was conducted in an open proceeding.

The trial judge not only did not order the courtroom closed, he repeatedly checked with counsel to make sure there was no obstacle to a public trial. The attorneys for both parties repeatedly assured the trial judge that the court did not need to take special measures to enable members of the public to observe the proceedings, and Carter's attorney even expressly told the court that it had been an open trial throughout. He later testified that Carter's family members complained to him that they had not been allowed in the courtroom, but at the time of the trial he made no mention of such a barrier to a public trial.

There is authority that a defendant's right to a public trial is not denied absent "some affirmative act by the trial court meant to exclude persons from the courtroom."

10

*United States v. Al-Smadi*, 15 F.3d 153, 154 (10th Cir. 1994). Nevertheless, a courtroom may be closed in the constitutional sense without an express judicial order. See, e.g., *Owens v. United States*, 483 F.3d 48, 63 (1st Cir. 2007), *abrogated on other grounds by Weaver*, 137 S. Ct. at 1907, 1910; *Watters v. State*, 328 Md. 38, 44, 49, 612 A.2d 1288 (1992) (defendant's Sixth Amendment right to public trial was violated where deputy sheriff closed courtroom to public).

In the present case, it is clear that the trial court took no affirmative steps to exclude the public from the courtroom. The court also made the factual finding that the public was not excluded by individuals acting without judicial authority. This finding was based on the lack of any complaint by defense counsel, despite his supposed awareness there was a problem, and on the temporal disparity between when the witnesses claimed to have been excluded and when the voir dire proceeding actually began. Despite the efforts of counsel for both parties, the individual posted at the courtroom door could not be identified and questioned, and the trial court elected to give little weight to the testimony that he barred certain members of the public from entering the courtroom.

When a constitutional question presents mixed questions of fact and law, Kansas appellate courts give deference to trial court factual findings that are supported by substantial evidence. See, e.g., *State v. Warrior*, 294 Kan. 484, 509, 277 P.3d 1111 (2012) (whether *Brady* violation occurred was legal question to be determined de novo based on trial court's findings of fact).

Deference to the trial court is particularly appropriate here, not only because the court's findings had support in the record, but also because the trial judge was the observer of the entire proceedings in question. Furthermore, Carter's trial counsel's repeated assertions at trial that there was no open court issue belied his testimony two

11

years later that the court had been closed to Carter's family members. A trial court may legitimately give little weight to the testimony of a party who, at trial, assured a court that there was no problem and then, two years later, came back and asserted the existence of a reversible problem necessitating a new trial. If there is ambiguity in the facts above, that ambiguity was created in large part by the silence of counsel and members of the public at the time when correction of the problem was possible.

For these reasons, we conclude that the trial court determination that the voir dire proceeding was open was reasonable and supported by substantial competent evidence. We find no violation of Carter's right to a public trial.

EVIDENCE IMPEACHING ALIBI TESTIMONY

On December 6, 2017, Carter filed a notice of alibi. The anticipated alibi was that:

> "[H]e was at the following locations at the time of the occurrence in the aforementioned matter before the Court:

> "The Defendant was with family, specifically his brother, Kenny Carter at the residence of the Defendant, which is clearly defined as another location during the alleged time and period for which the alleged offense(s) occurred on or about the 1st of December, 2015."

The notice went on to endorse Kenny Carter as a potential alibi witness.

Carter continued to press for allowing alibi witness testimony up to just a few days before trial. The Friday before trial, the court overruled the State's objection to the

admission of alibi testimony. At trial, the State called Kenny as a witness. On cross-examination, Carter's attorney asked a series of questions that produced testimony that Carter was at Kenny's home, sick in bed, at the time of the shootings.

The State called three law enforcement witnesses whose testimony controverted Kenny's testimony. Officer Sage Hemmert testified that Kenny told him soon after the shooting that the last time he saw Carter was on Thanksgiving, several days before the shooting. This testimony was supported by a recording taken at the time of the interview. Officer Lee Froese testified that he talked with Kenny on December 3, 2015, and Kenny told him he had not seen Carter for six days. This testimony was also supported by a recording of the interview.

On appeal, Carter asserts it was reversible error for the trial court to allow the State to produce witnesses testifying that he was not at home with his brother. Carter concedes he did not object to the testimony of witnesses who said he was not at home when the shootings took place.

K.S.A. 60-404 requires a contemporaneous objection to the admission of evidence in order to obtain appellate review:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

The statute requires each party to make a specific and timely objection at trial in order to preserve evidentiary issues for appeal. *State v. Brown*, 307 Kan. 641, 645, 413

P.3d 783 (2018). The rule serves to avoid the use of tainted evidence and thereby avoid possible reversal and a new trial. It not only gives the trial court the opportunity to address the issue, but it is also a practical necessity in order to bring litigation to an end. 307 Kan. at 645.

Carter asks this court to consider this issue based on exceptions to the preservation requirement. Exceptions exist for raising issues on appellate review without expressing an objection to the trial court, but K.S.A. 60-404 does not allow those exceptions to come into play in the context of the admissibility of evidence. *Brown*, 307 Kan. at 645; *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010).

For this reason, this issue is not properly before the court and may not serve as a basis for reversal.

EVIDENCE OF GANG ACTIVITY

Carter filed a pretrial motion asking the court to exclude any evidence of gang participation or activity. The State filed a pretrial motion seeking to introduce evidence of gang participation and activity. The trial court conducted a hearing and then granted the State's motion. The court stated as grounds for granting the motion: "Gang evidence is relevant as it pertains to identity, context, motive, and witness bias. The probative value outweighs the prejudice."

At trial, the State called several witnesses with special knowledge of gang culture to testify about motive and the effects of gang activity on how other witnesses might testify. Carter concedes on appeal that his trial counsel voiced no objection to that testimony.

14

As with the previous issue, the failure to make a contemporaneous objection determines the fate of this issue. Carter again contends that this is a purely legal question, which is contrary to the precedent cited above. He also contends that the pretrial motions and hearing should be considered a substitute for an objection at trial.

This court has recently rejected this theory. In *State v. Ballou*, 310 Kan. 591, 613, 448 P.3d 479 (2019), the court explained that a pretrial objection alone is not timely for purposes of K.S.A. 60-404 because an in limine ruling is subject to change as the case goes forward. The contemporaneous objection rule recognizes that different, more, or less evidence may come in at trial than was admitted or proffered at a pretrial hearing. Or a district court judge may simply see the issue differently after hearing additional arguments and evidence. Furthermore, the plain language of K.S.A. 60-404 requires a "timely interposed . . . objection."

This issue is therefore not properly before this court.

EXPERT TESTIMONY INTERPRETING CARTER'S E-MAIL

The State introduced an exhibit consisting of an e-mail Carter sent from prison shortly before trial. After Carter's counsel called into question what the e-mail meant, the State asked a subsequent witness, who was certified as an expert on gangs, to tell the jury what Carter meant with the e-mail. On appeal, Carter contends the testimony should not have been admitted.

The admission of expert testimony lies within the discretion of the district court and will not be reversed without a showing that the court abused its discretion. *State v.*

*Claerhout*, 310 Kan. 924, 932, 453 P.3d 855 (2019); *State v. Schwarm*, 271 Kan. 155, 164, 21 P.3d 990 (2001). A trial court abuses its discretion if its ruling was based on an error of fact, an error of law, or an otherwise unreasonable decision. *State v. Jones*, 306 Kan. 948, 957, 398 P.3d 856 (2017).

Captain Jared Schechter, who was responsible for monitoring prisoner e-mail, testified that, on November 17, 2017, Carter sent an e-mail to Cooksey stating:

> "If I do, he's going to continue it for four months and I'm trying to fight this on the streets. It will be 100 times better outcome. Now do you understand what I'm saying?"

On cross-examination, Schechter conceded that he did not know exactly what the e-mail meant. Carter's attorney suggested it might have meant that Carter might expect a better outcome once he hired an attorney, and Schechter said he did not know about that and he only read the e-mail out loud and he did not interpret it.

At the time the e-mail was introduced, it was given no context nor was its probative value explained. The defense raised no objection to its introduction. The e-mail was simply placed into evidence, and the witness conceded that the words were subject to the reader's understanding of them.

Sergeant Chad Beard is a gang intelligence officer with the Wichita Police Department. Carter's attorney conceded that Sergeant Beard was qualified as an expert on gang activity, and the trial court allowed him to testify as an expert. Sergeant Beard testified at length about a registry of known gang members in Wichita, the history of gang violence in the city, and markers for gang affiliation and gang activity. He then testified about the e-mail that Carter sent from prison.

16

The direct examination proceeded as follows:

"Q.    When you heard that, and previously you described that there is this code of honor, I guess, with gang members that they take care of stuff on the street?

"A.    Yes.

"Q.    Does that e-mail have any significance to you based on your training and experience?

"MR. LEON:  Your Honor, objection. This calls for speculation.

"MR. MUTH:  He can give an opinion based on his qualification of an expert.

"THE COURT:  Yes. I'm going to overrule the objection, but for this reason. You may answer the question if you can.

"A.    Thank you, Your Honor. Based on that statement and from my training and experience as a gang investigator, that means that they are going to go handle whatever in the streets. They are going to take care of the business outside of the court, law or police help or anything like. They are going to take care of it on their own."

A subsequent witness, Matthew Blank, testified about why Davis may have changed her story from the time she was originally interviewed, when she identified Carter as being in the car with Wimbley and Brent and saw him getting out of the car with them just before the shooting began, although she was not positive it was Carter. She told Blank that she thought it was Carter because the man she saw had a similar hat to Carter's, had similar hair to Carter's, and had the same facial features as Carter; Carter was always hanging out with the others and no one else in the group looked like Carter.

17

Her testimony at trial was that Carter was not present. Blank explained this change in her recounting of what she saw by testimony that Davis told him her safety had been threatened if she testified against Carter. He testified that the e-mail in question was an example of such a threat that would cause a witness to be afraid of what would happen to her after trial.

Both at trial and on appeal, Carter's counsel advanced a different understanding of the e-mail: that Carter was informing Cooksey he was having difficulty finding an attorney who would best represent his interests. He argued, for example, that "fighting something on the street is commonly understood to mean that a criminal defendant is seeking to be released from confinement to better defend his case."

Although the words of the e-mail do not appear ambiguous and the jury would likely have had no difficulty understanding their meaning without expert explanation, Carter called the meaning of the e-mail into question, and the expert witness rebutted Carter's proposed interpretation.

K.S.A. 2019 Supp. 60-456 governs the admissibility of opinion testimony. Under our statute, expert opinion testimony is admissible if the witness is qualified to render an opinion and such opinion is both reliable and relevant. K.S.A. 2019 Supp. 60-456(b). At trial, Carter did not object to Beard's qualifications or the reliability of his opinion testimony, and Carter's competing interpretation of the e-mail demonstrates the relevance of Beard's opinion evidence. Accordingly, we find no abuse of discretion in the decision to admit Beard's testimony about the e-mail.

18

Carter argues on appeal that the felony-murder statute creates a mandatory presumption of intent to kill that invades the province of the jury. This court recently addressed the same issue in *State v. Patterson*, 311 Kan. 59, 455 P.3d 792 (2020).

After extensive analysis, the *Patterson* court concluded:

"The Kansas felony-murder rule does not operate as an unconstitutional, conclusive presumption that invades the jury's province. As the State points out, intent to kill is not an element of felony murder in this state. The statute expressly requires proof the defendant engaged in dangerous, felonious conduct and that a death occurred as a result of that conduct.

"By codifying participation in the felony as a statutory alternative for the intent and premeditation otherwise required for a first-degree murder conviction, the statute imposes a rule of law. It does not remove from the jury's consideration an intent element required by a criminal statute." 311 Kan. at 67.

Carter provides no new arguments that invite this court to revisit its decision in *Patterson*.

CONCLUSION

Finding no error in the proceedings above, we affirm Carter's convictions and sentence.

TRISH ROSE, District Judge, assigned.[1]

_____

[1]**REPORTER'S NOTE:** District Judge Rose was appointed to hear case No. 120,103 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Carol A. Beier.