No. 96,526

STATE OF KANSAS, *Appellant,* v. SHAWN M. JOHNSON, *Appellee.*

(218 P.3d 46)

Opinion filed October 30, 2009.

*Keith E. Schroeder*, district attorney, argued the cause, and *Karen S. Smart*, assistant district attorney, and *Phill Kline*, attorney general, were with him on the brief for the appellant.

*Lane Williams*, of Disability Rights Center of Kansas, of Topeka, argued the cause, and *Kirk W. Lowry*, of the same firm, was with him on the briefs for the appellee.

The opinion of the court was delivered by

JOHNSON, J.: Shawn M. Johnson seeks review of the Court of Appeals' decision in *State v. Johnson*, No. 96,526, unpublished opinion filed July 20, 2007 (*"Johnson II"*), which reversed the district court's dismissal of the criminal charges against Johnson, directed the district court to order Johnson to submit to a psychiatric or psychological examination, and instructed the district court to hold a hearing to determine whether Johnson has now become competent to stand trial. Finding that the district court followed the appropriate statutory procedures and that there were no reasonable grounds to support an order for another competency hearing, we reverse the Court of Appeals and affirm the district court's dismissal of the criminal proceedings.

This is the second time the Court of Appeals has reviewed this case and attempted to interpret the provisions of K.S.A. 22-3301 *et seq.*, dealing with the competency of a defendant to stand trial. See *State v. Johnson*, No. 91,797, unpublished opinion filed July 22, 2005 (*"Johnson I"*). Unfortunately, on both occasions, the panels failed to review the cross-referenced provisions of Article 29 of Chapter 59 of the Kansas Statutes Annotated, relating to the involuntary commitment of mentally ill persons. That failure apparently led to a misunderstanding of how those involuntary commitment procedures could be applied in the competency determination of a person who has suffered a traumatic brain injury, *i.e.*, who does not fit the criteria for a "mentally ill person" for involuntary commitment under K.S.A. 59-2945 *et seq.*

The event precipitating this case occurred on November 24, 2001, when Johnson drove a vehicle into a tree, killing a passenger. Johnson was hospitalized with serious injuries, including a coma-inducing traumatic brain injury. Several months later, on July 8, 2002, the Reno County prosecutor's office charged Johnson with involuntary manslaughter, claiming that he was driving under the influence when the fatality accident occurred. In October 2002, pursuant to K.S.A. 22-3302(1), the district court ordered an evaluation at Horizon's Mental Health Center to assess Johnson's competency to stand trial, and subsequently held hearings on December 18, 2002, and January 2, 2003.

Delmar Thibault, a licensed masters-level psychologist from Horizons, testified on behalf of the State that he had met with Johnson for approximately 2 hours and had performed some limited testing, from which he concluded that Johnson was competent to stand trial. In contrast, Johnson presented the testimony of Mitchel A. Woltersdorf, Ph.D., a clinical and forensic neuropsychologist with the Midwest Brain Function Clinic. Dr. Woltersdorf gave a detailed description of the extensive battery of tests performed on Johnson on January 10, 2002, and repeated on July 31 and August 1, 2002, explaining that the nature of the testing done on head injury patients made separate testing for competency to stand trial unnecessary. Johnson showed some modest improvement on the second set of tests, but he still displayed widespread and severe deficits in memory, nonverbal reasoning, sensory-perception, and processing speed, indicating a permanent impairment in these areas. Dr. Woltersdorf opined that Johnson could understand the nature and purpose of the criminal proceedings against him, but would be unable to make or assist in making his defense, *i.e.*, that Johnson was not competent to stand trial.

The district court found that the conclusions of Dr. Woltersdorf, which were supported by more objective scientific data, were more credible than the conclusions of Dr. Thibault. Accordingly, the court held that Johnson was unable to assist his counsel in the making of a defense or assist his counsel during trial or hearing and therefore was incompetent to stand trial.

Next, the district court ordered that Johnson be committed for evaluation and treatment, pursuant to K.S.A. 22-3303(1), for a period not to exceed 90 days. Initially, the order was for commitment to Larned State Hospital, but ultimately, on April 18, 2003, Johnson was ordered to be committed to the Oklahoma Neuro-Restorative Center (ONRC), a facility which presumably was better equipped to address Johnson's diminished cognitive abilities resulting from the traumatic brain injury. The facility's chief medical officer was directed to certify to the court within 90 days whether Johnson had a substantial probability of attaining competency to stand trial in the foreseeable future.

On June 4, 2003, ONRC filed a neuropsychological evaluation report with the court. In the report, Dr. Roscoe G. Burrows opined that Johnson would be unable to effectively function at trial and that the doctor did not expect any dramatic or meaningful changes in Johnson's cognitive status. Based on the report, the district court found that there was not a substantial probability that Johnson would attain competency to stand trial in the foreseeable future. In accordance with K.S.A. 22-3303(1), the district court ordered the Secretary of Social and Rehabilitation Services (SRS) to commence involuntary commitment proceedings pursuant to Article 29 of Chapter 59 of the Kansas Statutes Annotated.

On December 3, 2003, SRS sent the prosecutor's office a letter acknowledging that nothing further had been done in the matter and inquiring about Johnson's location. The State then filed a motion for a status hearing. Attached to the motion was an affidavit from the lead investigator on the case, Detective Stewart, who had observed Johnson engaged in a conversation with a store clerk in which Johnson was able to discuss a computer program "in some technical detail." Consequently, at the January 23, 2004, hearing on the motion, the State asked the court to reconsider its incompetency order in light of the new evidence from the detective. The court found that the detective's affidavit did not refute the expert evidence before the court and denied the request for reconsideration. The court took the matter of SRS's inaction under advisement and temporarily stayed its order to commence involuntary commitment proceedings.

In a subsequent memorandum opinion and order, the court reiterated that Johnson remained incompetent to stand trial and that there had been no evidence proffered to the contrary. Further, the court found that a letter submitted by Kansas Advocacy and Protective Services, Inc. (KAPS) was persuasive on the question of the involuntary commitment proceedings. The memorandum decision recited that the letter was "attached hereto and incorporated by reference."

The KAPS letter pointed out that the evidence at the competency hearing established that Johnson was diagnosed with a traumatic brain injury, which "means non-degenerative, structural

brain damage resulting in residual deficits and disability that have been acquired by external physical injury. See Kansas Administrative Regulation 30-5-300(a)(48)." The letter succinctly stated: "Traumatic brain injury is not mental illness." That statement was corroborated by quoting the definitions of "mentally ill person" and "mentally ill person subject to involuntary commitment for care and treatment" contained in K.S.A. 59-2946(e) and (f)(1).

Additionally, the letter explained the disconnect in K.S.A. 22-3303's mandate that the court must order SRS to commence involuntary commitment proceedings pursuant to Article 29 of Chapter 59 of Kansas Statutes Annotated. For SRS to comply with that order, it must have a petitioner who is willing to sign a verified petition that alleges, *inter alia*, that the petitioner has a reasonable belief that the respondent "is a mentally ill person subject to involuntary commitment." K.S.A. 59-2957(b)(1). All of the evidence contradicted such an allegation.

Accordingly, the district court found, based upon the previously admitted medical testimony and reports, that Johnson was not a "mentally ill person" within the meaning of the involuntary commitment statutes, *i.e.*, the prerequisites for a petition under K.S.A. 59-2957 were not present. The court then opined that the law should not require the performance of a futile act, presumably meaning that SRS should not be required to file a perjurious or facially inadequate petition. The court set aside its prior order for commencement of involuntary commitment proceedings and dismissed the criminal case with prejudice.

The State appealed and the Court of Appeals reversed in *Johnson I*. *Johnson I* opined that the language of K.S.A. 2004 Supp. 22-3303(1) is clear and mandatory in its requirement that the district court issue an order to the Secretary of SRS to commence involuntary commitment proceedings. Slip op. at 11. The panel faulted the district court for failing to force SRS to comply with the initial order to commence Chapter 59 proceedings by utilizing its criminal contempt power, if necessary, and criticized the withdrawal of the order "based on the judge's own belief that Johnson was not, in fact, mentally ill." Slip op. at 11. The panel apparently ignored that portion of the district court's memorandum decision that in-

corporated the KAPS letter and failed to review and discuss the involuntary commitment provisions of Article 29 of Chapter 59. Moreover, the opinion appeared to presume that a traumatic brain injury was a mental illness.

Consequently, *Johnson I* remanded the case to the district court with directions to order the Secretary of SRS to commence involuntary commitment proceedings pursuant to Article 29 of Chapter 59 of the Kansas Statutes Annotated. Slip op. at 15. The opinion also held that the district court's failure to comply with K.S.A. 22-3303(1) resulted in an abuse of discretion in denying a supplemental competency hearing and an erroneous dismissal with prejudice. Slip op. at 14.

Inexplicably, the Supreme Court denied Johnson's petition for review, and the case was remanded to the district court. Upon remand, the district court dutifully issued the mandated order to SRS on November 7, 2005. On March 24, 2006, the Secretary of SRS filed a verified petition in the District Court of Ness County. The pleading was carefully worded to clarify that it was being filed pursuant to a court order, rather than alleging the petitioner's belief that Johnson was a mentally ill person subject to involuntary commitment. The petition included the statutorily required certificate from a qualified mental health professional, but that certificate stated that "Mr. Johnson is a medical patient surviving a severe TBI & is not mentally ill." The certificate contained the recommendation "that the patient **not** be detained and admitted to an appropriate inpatient treatment facility for further observation and treatment pending court proceedings." The petitioner also attached Dr. Woltersdorf's evaluation from August 2002 and the ONRC evaluation from May 2003, as well as Johnson's Home & Community Based Services TBI Waiver Plan of Care.

Upon receiving the Chapter 59 petition, the district court found that there had been no showing of probable cause to believe that Johnson was a mentally ill person subject to involuntary commitment, as that term is defined at K.S.A. 59-2946(f). The court noted that the Secretary was required to file the petition under K.S.A. 22-3303, but opined that no useful purpose could be fulfilled by proceeding further. To the contrary, continuing the proceedings

"any further would serve only to delay or interrupt the appropriate provision of services to Mr. Johnson." The court dismissed the petition, released Johnson from the jurisdiction of the court, and directed that the Reno County District Court be notified of the dismissal.

SRS apparently notified the district attorney's office that the Ness County District Court had found that Johnson was not a mentally ill person. On March 29, 2006, the State filed a request for a hearing to determine whether Johnson had been restored to competency, specifically complaining that SRS had failed to comply with K.S.A. 22-3305(2), which requires an opinion from the head of the treatment facility as to whether Johnson was now competent to stand trial. The State argued that a new competency evaluation was justified because it had been approximately 4 years since the last set of competency evaluations. Johnson objected to the request, arguing that the State had presented no new evidence which would provide reasonable grounds to conduct a new hearing pursuant to K.S.A. 22-3303(3).

Apparently, the district court advised the parties by letter that it was not ordering Johnson to submit to a new competency evaluation unless the State proffered new evidence to show that Johnson had been restored to competency. However, that letter is not in the record on appeal. On April 24, 2006, the prosecutor filed a motion requesting the district court to reconsider the State's request for a competency evaluation. The district court issued an order denying the State's requests for another competency evaluation and a hearing to determine whether competency had been restored. The court also denied the request for a court order directing SRS to supplement its notification pursuant to K.S.A. 22-3305(2), based on the simple fact that Johnson had not been detained or admitted to a psychiatric treatment facility during the pendency of the involuntary commitment proceeding. The pending charges were dismissed without prejudice.

The State again appealed to the Court of Appeals, which in *Johnson II* again reversed the district court's order dismissing the criminal charges. The Court of Appeals opined that the district court had "abused its discretion when it denied the State's motion for an

evaluation and hearing 'on the issue of whether or not the defendant has been restored to competency.' K.S.A. 2006 Supp. 22-3305(2)." *Johnson II*, slip op. at 12. It based that conclusion on several factors, including the provisions of K.S.A. 2006 Supp. 22-3305(2) which direct a treatment facility to render an opinion as to current competency; the fact that the evidence of competency at the original hearing was controverted and limited to only one of the two statutory factors; the Court of Appeals' assessment that the evidence available since the original determination suggests that Johnson's mental processing, memory loss, and distractibility had shown some improvement over time; the panel's own view of the significance of Johnson's 2002 performance on the Trail's Test administered by ORNC; Detective Stewart's affidavit of the conversation he overheard between Johnson and the store clerk; the panel's belief that Dr. Woltersdorf's recommendation for computer-assisted cognitive rehabilitation was an acknowledgement that Johnson could get better; and Dr. Woltersdorf's discussion of strategies or accommodations which could be employed at trial to mitigate the effects of Johnson's brain injury.

The Court of Appeals then "endeavored to fashion a remedy that would provide relief to the State yet facilitate the prompt resolution of whether Johnson has been restored to competency." *Johnson II*, slip op. at 21. It remanded the case to the district court with directions to order a psychiatric or psychological examination for the defendant in a manner provided by K.S.A. 22-3302(3), and, upon receipt of the examination report, the district court was directed to hold a hearing to determine whether the defendant has been restored to competency. Slip op. at 21.

## STATUTORY PROVISIONS

We begin by describing the path which must be traversed to comport with the statutes governing a defendant's competency to stand trial, albeit with the knowledge that our journey will dead end at the edge of a precipice which only the legislature can bridge. We will be called upon to interpret the statutes governing competency to stand trial, K.S.A. 22-3301 *et seq.*, and the statutory provisions for the care and treatment for mentally ill persons,

K.S.A. 59-2945 *et seq*. The interpretation of a statute is a question of law over which this court has unlimited review. *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007).

Our journey is guided by certain rules of statutory construction:

"The fundamental rule of statutory construction to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. [Citation omitted.]" *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 (2003).

Although ordinary words are to be given their ordinary meanings, " '[t]echnical words and phrases, and other words and phrases that have acquired a peculiar and appropriate meaning in law, shall be construed according to their peculiar and appropriate meanings.' " *In re Vanderblomen*, 264 Kan. 676, 680, 956 P.2d 1320 (1998) (quoting *Galindo v. City of Coffeyville*, 256 Kan. 455, Syl. ¶ 5, 885 P.2d 1246 [1994]). Nevertheless, a court may only go so far in attempting to give effect to legislative intent.

"It is also well established that the doctrine of liberal construction does not allow this court to delete vital provisions or supply vital omissions in a statute. No matter what the legislature may have really intended to do, if it did not in fact do it, under any reasonable interpretation of the language used, the defect is one which the legislature alone can correct. [Citation omitted.]" *Eveleigh v. Conness*, 261 Kan. 970, 978, 933 P.2d 675 (1997).

The criteria for the underlying competency inquiry is set forth in the definition contained in K.S.A. 22-3301(1):

"(1) For the purpose of this article, a person is 'incompetent to stand trial' when he is charged with a crime and, because of mental illness or defect is unable:
  (a) To understand the nature and purpose of the proceedings against him; or
  (b) to make or assist in making his defense."

The connecting word "or" ordinarily indicates that the connected items are in the disjunctive. See 82 C.J.S, Statutes 331 ("and" ordinarily conjunctive; "or" ordinarily disjunctive). Thus, a person who is either unable to understand the criminal proceedings or unable to assist with his or her defense is considered incompe-

tent to stand trial. Further, the reason for the defendant's inability to comprehend can be caused by either a mental illness or a mental defect. In this case, it will be important to keep in mind that Johnson claimed to fall within the definition of a person incompetent to stand trial because of a mental defect that rendered him unable to make or assist in making his defense:

The issue of a defendant's competency to stand trial may be raised by the defendant, the defendant's counsel, the prosecutor, or *sua sponte* by the judge at any time between the filing of the charging document and the pronouncement of sentence. If the judge has reason to believe that the defendant is incompetent to stand trial, the criminal proceedings are suspended and a competency hearing must be held. K.S.A. 22-3302(1). The judge can order a psychiatric or psychological examination of the defendant and may impanel a six-person jury. K.S.A. 22-3302(3).

After the hearing, if the defendant is found to be competent, the criminal proceedings are resumed. K.S.A. 22-3302(4). If the defendant is found to be incompetent to stand trial, the defendant shall be committed for evaluation and treatment to the state security hospital or any appropriate county or private institution; such commitment shall not exceed 90 days. K.S.A. 22-3302(5); K.S.A. 22-3303(1). Within that 90-day period, the chief medical officer of the commitment institution "shall certify to the court whether the defendant has a substantial probability of attaining competency to stand trial in the foreseeable future." K.S.A. 22-3303(1). If such probability exists, the defendant is ordered to remain in the institution for 6 months from the date of the original commitment or until he or she attains competency to stand trial, whichever occurs first. K.S.A. 22-3303(1).

If the institution's certification states that a substantial probability of attaining competency does not exist or if a detained defendant does not attain competency within 6 months of the original date of commitment, the court "shall order the secretary of social and rehabilitation services to commence involuntary commitment proceedings pursuant to article 29 of chapter 59 of the Kansas Statutes Annotated, and any amendments thereto." K.S.A. 22-3303(1), (2). However, for certain high severity level crimes, which

are not involved in this case, the definition of a "mentally ill person subject to involuntary commitment for care and treatment" is modified. That modification will be briefly discussed below.

To this point in our case, the district court had strictly followed the statutory scheme. The issue of competency was timely raised, and the district court formed a belief that Johnson was incompetent to stand trial. The judge referred Johnson to Horizons for a competency evaluation. The defendant obtained an evaluation from Dr. Woltersdorf and submitted a report with his own motion for a competency hearing. A full hearing was conducted, after which the district court made findings on the credibility of the evidence presented and on the ultimate issue, declaring that Johnson was not competent to stand trial. The court committed Johnson to ONRC for up to 90 days. Dr. Burrows, the chief medical officer of ONRC, made the requisite certification to the district court, which then made the finding that there was not a substantial probability that Johnson was likely to be competent to stand trial in the foreseeable future. Pursuant to K.S.A. 22-3303(1), the district court ordered the Secretary of SRS to commence involuntary commitment proceedings under Article 29 of Chapter 59 of the Kansas Statutes Annotated.

Then, however, progress on the case halted. In *Johnson I*, the Court of Appeals appeared perplexed as to why SRS had not commenced the involuntary commitment proceedings and why the district court had not invoked its contempt powers to force SRS to do so. Perhaps if the panel had carefully considered that portion of the district court's memorandum decision that incorporated by reference the KAPS letter, it would have discerned that the answers were to be found in the provisions of K.S.A. 59-2945 *et seq.*

Again, we will begin our review of the applicable statutory provisions by looking at the fundamental definitions underlying the Act. K.S.A. 59-2946 provides:

"When used in the care and treatment act for mentally ill persons:

. . . .

"(e) 'Mentally ill person' means any person who is suffering from a mental disorder which is manifested by a clinically significant behavioral or psychological syndrome or pattern and associated with either a painful symptom or an impair-

ment in one or more important areas of functioning, and involving substantial behavioral, psychological or biological dysfunction, to the extent that the person is in need of treatment.

"(f)(1) 'Mentally ill person subject to involuntary commitment for care and treatment' means a mentally ill person, as defined in subsection (e), who also lacks capacity to make an informed decision concerning treatment, is likely to cause harm to self or others, and whose diagnosis is not solely one of the following mental disorders: Alcohol or chemical substance abuse; antisocial personality disorder; mental retardation; organic personality syndrome; or an organic mental disorder."

Prior to the 1996 enactment of the current Care and Treatment Act for Mentally Ill Persons, K.S.A. 59-2945 *et seq.*, the predecessor act, the Treatment Act for Mentally Ill Persons, K.S.A. 59-2901 *et seq.*, only contained a definition for "mentally ill person," which was found in K.S.A. 59-2902(h). See *In re Vanderblomen*, 264 Kan. at 680. In providing separate definitions for "mentally ill person" and "mentally ill person subject to involuntary commitment for care and treatment," the new Act clarified " 'that there are certain mentally ill persons who should not be subject to involuntary proceedings to restrict their liberty.' " *In re Vanderblomen*, 264 Kan. at 682 (quoting comments of the Care and Treatment Advisory Committee of the Judicial Council). The mental disorders listed in K.S.A. 59-2946(f)(1) as being specifically *not* subject to involuntary commitment were intentionally excluded because they " 'are generally professionally recognized as unresponsive to psychiatric treatment.' " *In re Vanderblomen*, 264 Kan. at 682 (quoting comments of the Care and Treatment Advisory Committee of the Judicial Council).

According to all of the evidence in the record, including all of the professional diagnoses, Johnson was afflicted with a traumatic brain injury. We have previously clarified that a traumatic closed head injury resulting from a motor vehicle accident is an " 'organic mental disorder,' which . . . [is] one of those diagnoses which will not justify an involuntary commitment." *In re Vanderblomen*, 264 Kan. at 683. Like Vanderblomen, Johnson was not a mentally ill person subject to involuntary commitment for care and treatment because his sole diagnosis was an organic mental disorder.

Armed with that knowledge, we proceed to consider what the SRS had to do to commence the court-ordered involuntary commitment proceedings. K.S.A. 59-2957 sets forth the requirements of a petition to obtain a judicial determination of mental illness, an obvious prerequisite to an involuntary mental illness commitment. First, the petition must be verified, *i.e.*, the petitioner must swear an oath that the statements contained in the petition are true and correct. One of the statements required to be contained in the petition is "[t]he petitioner's belief that the named person is a mentally ill person subject to involuntary commitment and the facts upon which this belief is based." K.S.A. 59-2957(b)(1). Thus, the first hurdle for the Secretary of SRS was how to swear an oath that the Secretary believed Johnson to be a mentally ill person subject to involuntary commitment and how to state the true and correct facts upon which that belief was based when all of the facts available to the Secretary refuted such a belief. Because Johnson was solely diagnosed with an organic mental disorder, he was statutorily excluded from the definition of a mentally ill person subject to involuntary commitment, and the Secretary could not swear otherwise.

Furthermore, the petition must be accompanied by a certificate from a physician, psychologist, or qualified mental health professional stating that such professional has personally examined the person and any available records and has found that the person, in such professional's opinion, is likely to be a mentally ill person subject to involuntary commitment for care and treatment under the Act. K.S.A. 59-2957(c)(1). The provision provides an exception where the proposed patient has been so uncooperative as to prevent an examination, but that was not the case here. Johnson had cooperated with all of the examiners and, presumably, SRS had access to the reports from Dr. Woltersdorf, Dr. Burrows, and Mr. Thibault. However, none of those professionals' diagnoses would support an allegation that Johnson was mentally ill for involuntary commitment purposes. SRS was simply unable to comply with the certificate requirement.

Thus, we have reached our first statutory dead end. Although K.S.A. 22-3303(1) mandates that the district court order SRS to

commence proceedings to involuntarily commit a defendant who has been adjudged incompetent to stand trial with no substantial probability of attaining competency in the foreseeable future, SRS cannot legally comply with that order under K.S.A. 59-2945 *et seq.* if the incompetency is due solely to an organic mental disorder such as traumatic brain injury. The district court understood that dilemma, as evidenced by the statement in the memorandum decision that the law should not require a futile act. Even the legislature apparently understood the problem as early as 2001, when it enacted K.S.A. 22-3306, entitled "Task force to study programs for alleged offenders with disabilities who are potentially incompetent to stand trial and make recommendations," which provides:

"The secretary of social and rehabilitation services shall convene a task force to study current programs and laws for alleged offenders with disabilities that render such offenders potentially incompetent to stand trial, *but who do not meet the criteria for involuntary commitment under Kansas law.* The task force shall review and make recommendations on the adequacy of Kansas programs and services, and current Kansas law, in protecting public safety and in providing services and support to such alleged offenders. The secretary shall report to the judiciary committee during the 2001 interim and shall make a final report including programmatic and statutory recommendations to the 2002 legislature." (Emphasis added.)

As the legislature noted, the competing interests are protecting public safety on the one hand, and providing services and support for persons with disabilities on the other. If a person is incompetent to stand trial and also cannot be committed for mental illness treatment, that person is simply returned to the community without supervision, in derogation of public safety. Yet, if a person has a condition that cannot be improved through treatment, *e.g.*, a traumatic brain injury, then involuntarily committing that person under K.S.A. 59-2945 *et seq.* is akin to a life sentence without possibility of parole. In 2001, the legislature struck a balance between the competing interests by amending K.S.A. 22-3303(1) to add a provision which would permit the involuntary commitment of persons who are incompetent to stand trial because of one of the excepted diagnoses listed in K.S.A. 59-2946(f)(1), but who have been charged with certain crimes. The added provision states:

"When a defendant is charged with any off-grid felony, any nondrug severity level 1 through 3 felony, or a violation of K.S.A. 21-3504 [aggravated indecent liberties with a child], 21-3511 [aggravated indecent solicitation of a child], 21-3518 [aggravated sexual battery], 21-3603 [aggravated incest] or 21-3719 [aggravated arson], and amendments thereto, and commitment proceedings have commenced, for such proceeding, 'mentally ill person subject to involuntary commitment for care and treatment' means a mentally ill person, as defined in subsection (e) of K.S.A. 59-2946, and amendments thereto, who is likely to cause harm to self and others, as defined in subsection (f)(3) of K.S.A. 59-2946, and amendments thereto. *The other provisions of subsection (f) of K.S.A. 59-2946, and amendments thereto, shall not apply.*" (Emphasis added.) K.S.A. 22-3303(1).

Unfortunately, *Johnson I* did not appear to pick up on the legislatively recognized problem, because it remanded with directions for the district court to reinstate and enforce the order for SRS to commence involuntary commitment proceedings, even though Johnson had not been charged with one of the crimes with a modified definition of mentally ill person subject to involuntary commitment for care and treatment. One can only imagine the consternation and frustration the district court and SRS must have experienced when faced with an appellate court mandate to do that which could not be done.

As it turned out, the district court's prediction was accurate. The filing of the commitment petition was truly a futile and superfluous act, correctly resulting in an immediate dismissal for lack of probable cause to believe that Johnson was a mentally ill person subject to involuntary commitment. See K.S.A. 59-2959(d)(3) (at temporary custody hearing, court must find probable cause or, lacking probable cause, "the court shall terminate the proceedings and release the person"); K.S.A. 59-2962 (court must find probable cause to order mental evaluation; lacking probable cause, "the court shall terminate the proceedings").

With the dismissal of the involuntary commitment petition, the disconnect with the competency statutes continued. Both *Johnson I* and *Johnson II* discuss K.S.A. 22-3305, which addresses what is to happen after SRS has commenced the Chapter 59 involuntary commitment proceedings. If the defendant is not admitted as a patient in the treatment facility to which he or she was sent for evaluation, the defendant is to remain in that institution and the

SRS is to notify the court and prosecutor of the county where the criminal proceedings are pending. K.S.A. 22-3305(1). Also, if a defendant has been admitted as a patient but is thereafter to be discharged, he or she is to remain at the institution while the court and prosecutor are notified. K.S.A. 22-3305(2). When giving the required notification to the court and prosecutor, the treatment facility is to include "an opinion from the head of the treatment facility as to whether or not the defendant is now competent to stand trial." K.S.A. 22-3305(2). The prosecutor may then request a hearing on the issue of competency restoration, but if such request is not made within 10 days of receipt of the treatment facility notification, "the court shall order the defendant to be discharged from commitment and shall dismiss without prejudice the charges against the defendant." K.S.A. 22-3305(2).

Obviously, this provision does not contemplate an immediate dismissal of the involuntary commitment petition for lack of probable cause to believe the patient is mentally ill, because without probable cause the defendant cannot be sent to a treatment facility for evaluation. If the defendant never gets to a treatment facility, then that non-existent facility cannot continue to detain the defendant and the head of the phantom facility cannot form an opinion as to the absent defendant's competency to stand trial.

In *Johnson II*, the Court of Appeals chastised SRS for failing to comply with the plainly-stated mandate of K.S.A. 22-3305(2) to provide a competency opinion from the head of the treatment facility. Again, the Court of Appeals looked solely at the competency statutes, without considering the interface with K.S.A. 59-2945 *et seq.*, and opined that SRS should have done the impossible. This time, however, it was not only legally impossible for SRS to comply with the provisions of the competency statutes, but it was physically impossible as well because there was no treatment facility from which to obtain an opinion. Accordingly, *Johnson II*'s reliance on a violation of K.S.A. 22-3305(2) is misplaced.

Finally, we come to the only statute which has any relevance to Johnson's case at this time. K.S.A. 22-3303(3) provides a mechanism for the district court to revisit the competency issue. It states, "When reasonable grounds exist to believe that a defendant who

has been adjudged incompetent to stand trial is competent, the court in which the criminal case is pending shall conduct a hearing in accordance with K.S.A. 22-3302 and amendments thereto to determine the person's present mental condition." K.S.A. 22-3303(3).

## REHEARING ON COMPETENCY

The Court of Appeals applied an abuse of discretion standard of review, presumably relying on the language in K.S.A. 22-3305(2) that says the court "may" set a hearing after notification of discharge from the treatment facility. Here, we are dealing with K.S.A. 22-3303(3), which says the court "shall conduct a hearing." Nevertheless, in determining whether reasonable grounds existed to revisit the competency issue, we should afford a great deal of deference to the trial court that conducted the original proceedings.

On the existence of reasonable grounds to believe that Johnson had become competent to stand trial, the district court made the following findings:

"2. The defendant was found incompetent to stand trial as a result of brain trauma and the evidence established the effects of the trauma are permanent and irreversible, and therefore, the passage of time is not a reasonable ground to believe the defendant is competent.

"3. The recent dismissal of involuntary commitment proceedings in Ness County District Court Case No. 2006-CT-02 does not provide reasonable grounds to believe that the defendant is competent as contemplated by K.S.A. 2005 Supp. 22-3303(3)."

The district court was absolutely correct in its assessment of the relevance of the dismissal of the involuntary commitment proceedings. That action simply meant that there was no probable cause to believe that Johnson was a mentally ill person subject to involuntary commitment for care and treatment because his sole diagnosis was an organic mental disorder. An organic mental disorder is, however, a mental defect within the meaning of the competency statutes. As noted previously, the district court understood the distinction; the prosecutor should have understood it as well.

The district court's finding as to the nature and extent of Johnson's traumatic brain injury is directly supported by the opinions of both Dr. Woltersdorf and Dr. Burrows. Even Mr. Thibault, who testified for the State, did not dispute the diagnosis, but rather he simply disputed the effect of the injury on Johnson's ability to assist with his defense. Even then, Mr. Thibault acknowledged that Dr. Woltersdorf's testing was considerably more thorough. The district court specifically found Dr. Woltersdorf's testimony to be more credible.

Nevertheless, it is not the function of an appellate court to weigh conflicting evidence, to evaluate witnesses' credibility, or to redetermine questions of fact. *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009). The Court of Appeals appeared to do all three in *Johnson II*.

One of factors the Court of Appeals cited as supporting a new competency evaluation and hearing was a belief that the original competency hearing "was both controverted and limited in scope." *Johnson II*, slip op. at 16. A determination of whether reasonable grounds existed to have a second competency hearing should not lead an appellate court to redetermine the factual questions from the original hearing. Moreover, as we noted, incompetency can occur if the defendant is *either* unable to understand the nature and purpose of the proceedings against him *or* unable to make or assist in making his defense. The fact that only one of the alternative definitions of incompetency was present in the case does not provide reasonable grounds to believe that competency has been restored.

The Court of Appeals not only weighed the evidence, it endeavored to provide its own analysis of the significance of certain test scores. That task was best left to the experts. Two of those experts, Dr. Woltersdorf and Dr. Burrows, opined that, given the lapse of time since the accident, they would not expect to see any significant improvement in Johnson's cognitive abilities. In rendering those opinions, the experts had the benefit of Johnson's results on the base line tests in January 2002 and the results from the same tests which were given subsequently. Although the experts noted slight improvement on the later tests, part of that was attributed to the

patient's familiarity with the tests the second time around. Nevertheless, the experts had the test results when opining that Johnson would not significantly improve. We should not question the credibility of those opinions based upon our own lay analysis of what the test results show.

Moreover, the experts' opinions directly refute *Johnson II's* assertion that the passage of time since the last medical evaluation of Johnson's cognitive abilities provides a reasonable ground to believe he is now competent. If the diagnosis is permanent and irreversible brain damage, the relative date of that assessment is immaterial.

Further, any reliance on the detective's affidavit setting forth the conversation he overheard between Johnson and a store clerk is suspect. The State provided no foundation as to the detective's knowledge of computer programs to give context to his statement that the conversation contained "some technical detail." For the uninformed, gibberish can sound like technical detail. Moreover, we do not know whether Johnson's part of the conversation was responsive to that of the clerk. Nevertheless, the district court considered the affidavit and opined that it did not override the expert opinions that were contained in the court file. We agree. If the State wanted an assessment of what the conversation may have meant on the issue of competency, it should have submitted the information to an expert for analysis.

Also, we question the Court of Appeals' characterization of Dr. Woltersdorf's recommendation that Johnson engage in computer-assisted cognitive rehabilitation. *Johnson II* viewed it as an acknowledgment that Johnson could be rehabilitated to competency to stand trial. We are unwilling to put those words in the doctor's mouth. The more likely reason for the treatment recommendation was to assist Johnson in reaching some level of independent living, rather than to attain competency to stand trial.

Finally, the Court of Appeals believed it was a factor that Dr. Woltersdorf had testified about "certain strategies or accommodations which could be employed by the district court during a trial of this matter in an effort to mitigate the effects of Johnson's brain injury." *Johnson II*, slip op. at 20. However, the doctor discussed

those possible strategies while giving his opinion that Johnson was incompetent to stand trial; he did not say that the strategies would resolve the problem. To the contrary, the doctor said that he knew of no adjustments in the courtroom which could compensate for Johnson's slow mental processing, which emanated from a non-healing area of the brain.

In conclusion, the district court's finding that the State had not proffered any evidence to establish reasonable grounds to believe that Johnson had been restored to competency to stand trial is supported by the record. In fact, the record provides reasonable grounds to believe that Johnson will never be restored to competency to stand trial. Accordingly, we reverse the Court of Appeals' decision and affirm the district court's order dismissing the criminal proceedings without prejudice.