IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,512


In the Matter of the Care and Treatment
of CLAY ROBERT SNYDER.


SYLLABUS BY THE COURT


1.

The Kansas Care and Treatment Act for Mentally Ill Persons, K.S.A. 59-2945 et seq., as applied via K.S.A. 2017 Supp. 22-3303 does not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.


2.

The Kansas Care and Treatment Act for Mentally Ill Persons, K.S.A. 59-2945 et seq., as applied via K.S.A. 2017 Supp. 22-3303 does not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.


3.

On the facts of this case, the evidence was sufficient to involuntarily commit the defendant for care and treatment.


Appeal from Pawnee District Court; JULIE F. COWELL, magistrate judge. Opinion filed July 27, 2018. Affirmed.

*Mary Curtis*, of Disability Rights Center of Kansas, of Topeka, argued the cause, and *Ronald D. Smith*, of Smith and Burnett, LLC, of Larned, was with her on the briefs for appellant.

*Dwight R. Carswell*, assistant solicitor general, argued the cause, and *Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.


1

The opinion of the court was delivered by

STEGALL, J.: After the Saline County District Court found Clay Snyder not competent to stand trial, the Kansas Department for Aging and Disability Services (KDADS) initiated involuntary commitment proceedings against him. Ultimately, the Pawnee County District Court found Snyder was mentally ill and dangerous under K.S.A. 2017 Supp. 59-2946(e) and (f)(3) and ordered him committed to Larned State Hospital (Larned) for care and treatment. Snyder appeals from this commitment order, alleging equal protection and due process violations and challenging the sufficiency of the evidence. Finding Snyder's constitutional rights were not violated and the evidence was sufficient to involuntarily commit him, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 2012 Snyder was charged with rape, aggravated criminal sodomy, and aggravated indecent liberties with a child in Saline County. Snyder filed a motion to determine his competency to stand trial, triggering a lengthy cycle of competency evaluations, judicial findings of incompetency, treatment to restore competency, and renewed efforts by the State to take Snyder to trial. This process has now spanned years and has been interrupted and prolonged at least twice by involuntary commitment proceedings under the Kansas Care and Treatment Act for Mentally Ill Persons (Care and Treatment Act), K.S.A. 59-2945 et seq. Snyder's competency detainment is the subject of a separate case, this day decided. See *In re Habeas Corpus Petition of Snyder*, 307 Kan. ___, ___ P.3d ___ (2018) (No. 117,167, this day decided).

Thus far, competency restoration efforts have proven unsuccessful. In November 2016, the Saline County District Court again found Snyder was not competent to stand trial with no substantial probability that he would attain competency in the foreseeable

2

future. Consequently, as directed by Kansas statute, the court ordered KDADS to commence involuntary commitment proceedings against Snyder. See K.S.A. 2017 Supp. 22-3303(1) ("If such probability does not exist, the court shall order the secretary for aging and disability services to commence involuntary commitment proceedings pursuant to article 29 of chapter 59 of the Kansas Statutes Annotated."). Three months later, KDADS filed a petition for determination of mental illness in Pawnee County, alleging Snyder was a mentally ill person subject to involuntary commitment for care and treatment at Larned.

The Pawnee County District Court held a bench trial on March 21, 2017. KDADS presented one witness, psychologist Jessica Zoglman, who testified about a report she wrote to the court recommending that Snyder be committed for inpatient treatment at Larned. The parties entered five exhibits into evidence:  (1) KDADS's petition for determination of mental illness, which included two of Snyder's competency evaluations; (2) Zoglman's curriculum vitae; (3) Zoglman's report to the court; (4) Snyder's recent Larned intake assessment; and (5) Snyder's petition for writ of habeas corpus in a separate case.

Zoglman testified that she reviewed Snyder's Larned admission records, which included an intake assessment completed by the admitting psychiatrist, and the two competency evaluations attached to the petition. She also conducted an interview with Snyder on March 10, 2017, and interacted with him in her duties as Larned unit psychologist. These records and interactions formed the basis of her report. Ultimately, she concluded Snyder was mentally ill, dangerous to others, and in need of treatment.

Zoglman testified that Snyder met the criteria for the diagnosis of "Intellectual Disability, mild as severity, as well as a number of different substance use disorders that are currently in remission." In her report, Zoglman stated she "ruled out a paraphilic related diagnosis at the present time" but noted Snyder's "[e]ncounter for mental health

3

services for perpetrator of nonparental child sexual abuse" was a condition that might be the focus of clinical attention. Zoglman testified that she used the word "condition" because Snyder did not meet the "habit criteria" for a diagnosis.

A discrepancy between Zoglman's testimony and report caused confusion about whether Snyder fit the definition of a "mentally ill person" for purposes of involuntary commitment. In her report, Zoglman did not check the box to indicate that Snyder was a mentally ill person. As Zoglman explained, the standardized report form defined "mentally ill person" in accordance with K.S.A. 2017 Supp. 59-2946(f)(1), which *excludes* persons solely diagnosed with an intellectual disability from being mentally ill persons subject to involuntary commitment. But this definition did not apply to Snyder, who was charged with an off-grid felony and found incompetent to stand trial. Instead, Snyder was subject to the definition of "mentally ill person" found in K.S.A. 2017 Supp. 59-2946(e), which does not contain this exclusion. See K.S.A. 2017 Supp. 22-3303(1) ("[F]or such proceeding, 'mentally ill person subject to involuntary commitment for care and treatment' means a mentally ill person, as defined in subsection [e] of K.S.A. 59-2946 . . . who is likely to cause harm to self and others, as defined in subsection [f][3] of K.S.A. 59-2946.").

Zoglman clarified that under the correct definition, she believed Snyder was a mentally ill person. Furthermore, Zoglman concluded Snyder met the "likely to cause harm" criteria set forth in K.S.A. 2017 Supp. 59-2946(f)(3) because, though he posed no immediate threat to himself, without supervision he could be dangerous to others because he did not understand the seriousness of the charges against him. As Zoglman explained,

> "The important piece is his lack of insight into that seriousness. You know when speaking with him for an interview . . . he was aware that his charges are related to, you know a sexual offense of a child. However, he indicated that it wasn't serious and so to me . . . he has a lack of insight, lack of appreciation for that seriousness. With the . . .

4

severity level of his charges being off grid, it is a concern that if he does not see that his current legal situation is a serious matter that potentially without supervision other actions or other things could happen."

Finally, Zoglman testified that Snyder needed treatment. She explained that treatment would not "cure" Snyder's intellectual disability; however, treatment such as group and individual therapy could help Snyder interact more appropriately, function better, and live with less stress. She concluded that "intensive supervision in a locked facility is care that is needed for Mr. Snyder."

Snyder testified briefly about his disability and the competency restoration classes he took at Larned. He demonstrated a poor understanding of the nature of his disability and the legal proceedings against him. The defense called no other witnesses.

The district court found Snyder met the criteria for involuntary commitment under the Care and Treatment Act as modified by K.S.A. 2017 Supp. 22-3303, stating:

> "I'm making the finding at this point that you meet the criteria for 3303, you're charged with an off-grid felony, there is a belief by the person who prepared the report that there is potential for dangerousness, you meet the criteria, so what happens then is that we do a care and treatment action."

That same day, the court entered an order stating, "After hearing all the evidence, statements and arguments of counsel, the Court finds by clear and convincing evidence that Clay Robert Snyder is a mentally ill person subject to involuntary commitment for care and treatment."

Snyder timely appealed the commitment order to the Court of Appeals. We subsequently transferred the case to this court on our own motion. See K.S.A. 20-3018(c) ("At any time on its own motion, the supreme court may order the court of appeals to transfer any case before the court of appeals to the supreme court for review and final determination.").

ANALYSIS

*1. Snyder was not denied equal protection.*

Snyder argues he was denied equal protection under the Fifth and Fourteenth Amendments because K.S.A. 2017 Supp. 22-3303 subjected him to a different standard for involuntary commitment based on his off-grid felony rape charge. He lodges an as-applied challenge, claiming there is no rational basis to distinguish between him and others who share his diagnosis based on the severity of charges alone. We disagree and conclude a conceivable rational basis exists to make such distinction.

"Determining a statute's constitutionality is a question of law subject to unlimited review." *Brennan v. Kansas Insurance Guaranty Ass'n*, 293 Kan. 446, 450, 264 P.3d 102 (2011). To the extent we must engage in statutory interpretation, our review is likewise unlimited. *Lozano v. Alvarez*, 306 Kan. 421, 423, 394 P.3d 862 (2017).

The parties agree rational basis scrutiny applies and that is the standard we apply. See *Heller v. Doe*, 509 U.S. 312, 319-21, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993) (applying rational basis review to equal protection challenge involving the mentally ill when the parties failed to argue for heightened scrutiny). Under rational basis review, we determine "whether a statutory classification bears some rational relationship to a valid legislative purpose." *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 316, 255 P.3d 1186 (2011); see *Heller*, 509 U.S. at 320. This standard

6

is a "'very lenient'" one. *Downtown Bar and Grill v. State*, 294 Kan. 188, 195, 273 P.3d 709 (2012) (quoting *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 258, 930 P.2d 1 [1996]). As the United States Supreme Court directed, "[A] classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Heller*, 509 U.S. at 320; see *Downtown Bar and Grill*, 294 Kan. at 195.

Under the Care and Treatment Act, a district court must find by clear and convincing evidence that a person is a "mentally ill person subject to involuntary commitment for care and treatment" in order to impose civil commitment. K.S.A. 2017 Supp. 59-2966(a). The definition of a "mentally ill person subject to involuntary commitment for care and treatment" breaks down as follows:  (1) the individual must be "a mentally ill person"; (2) who "lacks capacity to make an informed decision concerning treatment"; (3) who is "likely to cause harm to self or others"; and (4) "whose diagnosis is not solely one of the following mental disorders:  Alcohol or chemical substance abuse; antisocial personality disorder; *intellectual disability*; organic personality syndrome; or an organic mental disorder." (Emphasis added.) K.S.A. 2017 Supp. 59-2946(f)(1)-(3). "Mentally ill person" is defined as:

> "[A]ny person who is suffering from a mental disorder which is manifested by a clinically significant behavioral or psychological syndrome or pattern and associated with either a painful symptom or an impairment in one or more important areas of functioning, and involving substantial behavioral, psychological or biological dysfunction, to the extent that the person is in need of treatment." K.S.A. 2017 Supp. 59-2946(e).

Thus, the Care and Treatment Act excludes from involuntary commitment a mentally ill person solely diagnosed with an intellectual disability. See *State v. Johnson*, 289 Kan. 870, 882, 218 P.3d 46 (2009) (holding that a person solely diagnosed with an organic mental disorder does not meet the definition of a "mentally ill person subject to involuntary commitment for care and treatment" under K.S.A. 59-2946[f][1]).

7

However, K.S.A. 2017 Supp. 22-3303 changes the definition of "mentally ill person subject to involuntary commitment for care and treatment" for an individual like Snyder who has been charged with an off-grid felony and found incompetent to stand trial. Under K.S.A. 2017 Supp. 22-3303, a district court must determine whether an incompetent defendant charged with a felony has "a substantial probability of attaining competency to stand trial in the foreseeable future." If no such probability exists, the court "shall order the secretary for aging and disability services to commence involuntary commitment proceedings" under the Care and Treatment Act. K.S.A. 2017 Supp. 22-3303(1). Importantly, the statute provides unique commitment criteria for incompetent defendants charged with certain high-severity crimes:

> "When a defendant is charged with any off-grid felony, any nondrug severity level 1 through 3 felony, or a violation of K.S.A. 21-3504, 21-3511, 21-3518, 21-3603 or 21-3719, prior to their repeal, or subsection (b) of K.S.A. 21-5505, subsection (b) of 21-5506, subsection (b) of 21-5508, subsection (b) of 21-5604 or subsection (b) of 21-5812, and amendments thereto, and commitment proceedings have commenced, for such proceeding, 'mentally ill person subject to involuntary commitment for care and treatment' means a mentally ill person, as defined in subsection (e) of K.S.A. 59-2946, and amendments thereto, who is likely to cause harm to self and others, as defined in subsection (f)(3) of K.S.A. 59-2946, and amendments thereto. *The other provisions of subsection (f) of K.S.A. 59-2946, and amendments thereto, shall not apply*." (Emphasis added.) K.S.A. 2017 Supp. 22-3303(1).

See *Johnson*, 289 Kan. at 880-81 (noting that K.S.A. 22-3303 modifies the definition of "mentally ill person subject to involuntary commitment for care and treatment" for certain high severity crimes).

So while K.S.A. 2017 Supp. 59-2946(f)(1) generally excludes from involuntary commitment mentally ill persons whose sole diagnosis is an intellectual disability, K.S.A.

2017 Supp. 22-3303 removes this exclusion for one subset of mentally ill persons—those charged with specified crimes. Herein lies the distinction at the heart of Snyder's equal protection challenge. The question before us, then, is whether the fact that Snyder has been charged with one of these serious crimes provides a rational basis for treating Snyder differently from other persons who share his diagnosis for purposes of involuntary commitment under the Care and Treatment Act. See *Heller*, 509 U.S. at 320; *Downtown Bar and Grill*, 294 Kan. at 195. The answer is that it does.

In arriving at this answer, we need look no further than our own precedent. In *State v. Johnson*, the defendant was charged with involuntary manslaughter for killing his passenger in a car accident. As a result of the accident, the defendant suffered a traumatic brain injury that rendered him incompetent to stand trial. Yet, we held the defendant could not be involuntarily committed for care and treatment "because his sole diagnosis was an organic mental disorder" and he was not charged with a specified crime under K.S.A. 22-3303. 289 Kan. at 880-82. In so holding, we recognized the competing interests the Legislature balanced in K.S.A. 22-3303:

> "As the legislature noted, the competing interests are protecting public safety on the one hand, and providing services and support for persons with disabilities on the other. If a person is incompetent to stand trial and also cannot be committed for mental illness treatment, that person is simply returned to the community without supervision, in derogation of public safety. Yet, if a person has a condition that cannot be improved through treatment, *e.g.*, a traumatic brain injury, then involuntarily committing that person under K.S.A. 59-2945 *et seq.* is akin to a life sentence without possibility of parole. In 2001, the legislature struck a balance between the competing interests by amending K.S.A. 22-3303(1) to add a provision which would permit the involuntary commitment of persons who are incompetent to stand trial because of one of the excepted diagnoses listed in K.S.A. 59-2946(f)(1), but who have been charged with certain crimes." 289 Kan. at 884.

9

Indeed, it is entirely rational for the Legislature to limit the involuntary commitment of people who are mentally ill solely because of an intellectual disability to those charged with certain serious crimes. It is not irrational for the Legislature to conclude that a person charged with an off-grid felony—like raping a child—could be more dangerous to the public than someone charged with a lesser crime, or not charged with any crime at all. Thus, the distinction made—and the resulting difference in treatment—between Snyder and others who share his diagnosis arising out of the charges against Snyder is a reasonable one.

Furthermore, the Legislature "has broad constitutional authority to adopt statutory programs to confine and treat people who might be dangerous to themselves or others and who suffer from some mental ailment, whether a mental abnormality, a personality disorder, or a mental illness as statutorily defined," but need not exercise this authority to the fullest extent. *In re Care & Treatment of Hay*, 263 Kan. 822, 833, 953 P.2d 666 (1998). In *Hay*, we held the distinctions within the Sexually Violent Predator Act (SVPA), K.S.A. 59-29a01 et seq., did not violate equal protection because:

> "Equal protection of the law does not require the State to choose between attacking every aspect of public danger or not attacking any part of the danger at all. As we said in *Manzanares v. Bell*, 214 Kan. 589, 615, 522 P.2d 1291 (1974): "'[T]he legislative authority . . . is not bound to extend its regulations to all cases which it might possibly reach. The legislature 'is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be the clearest.'"'" *Hay*, 263 Kan. at 833.

Stated differently, equal protection does not require the Legislature to civilly commit all mentally ill persons who pose a danger to themselves or others—instead, it may rationally distinguish between them based on the level of harm posed to the public.

Before concluding, we note that Snyder relies on *Jackson v. Indiana*, 406 U.S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972), to establish his equal protection challenge. But in *Jackson*, the Supreme Court held the indefinite detainment of a defendant solely on account of his incompetency to stand trial violated the Equal Protection Clause because it condemned him to "permanent institutionalization" without the showing required for civil commitment. 406 U.S. at 730. Thus, the problem in *Jackson* was that the defendant was, in effect, institutionalized for life *without* the protection of a statutorily prescribed involuntary commitment procedure for care and treatment—a problem not presented here.

Because a rational basis exists to distinguish between Snyder and others who share his diagnosis based on his off-grid felony charge, we hold Snyder has suffered no equal protection violation.

2. *Snyder was not denied due process.*

Snyder claims his civil commitment violates due process because: (1) K.S.A. 2017 Supp. 22-3303 substitutes Snyder's charges for proof that he is dangerous; (2) Snyder's intellectual disability is not a mental illness; and (3) the State cannot provide treatment that will cure or improve his intellectual disability. We disagree and hold the Care and Treatment Act as applied to Snyder via K.S.A. 2017 Supp. 22-3303 does not violate due process. Furthermore, we hold the Due Process Clause does not obligate the State to release individuals like Snyder from civil commitment simply because their mental conditions cannot be cured.

Civil commitment is a "significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). As the Supreme Court has stated, "[T]he Due Process Clause requires the State in a civil-commitment proceeding to demonstrate by clear and convincing evidence that the

11

individual is mentally ill and dangerous." *Jones v. United States*, 463 U.S. 354, 362, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983); see *Kansas v. Hendricks*, 521 U.S. 346, 358, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) ("We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as 'mental illness' or 'mental abnormality.'"); *Cooper v. Oklahoma*, 517 U.S. 348, 368, 116 S. Ct. 1373, 134 L. Ed. 2d 498 (1996) ("[D]ue process requires at a minimum a showing that the person is mentally ill and either poses a danger to himself or others or is incapable of 'surviving safely in freedom.'"); *Foucha v. Louisiana*, 504 U.S. 71, 75-76, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992).

Snyder claims that K.S.A. 2017 Supp. 22-3303 substitutes the type of charges brought against him for proof that he is actually dangerous. However, a cursory review of the plain language of the statute makes it apparent that this is not the case. To involuntarily commit Snyder under the Care and Treatment Act as applied to Snyder via K.S.A. 2017 Supp. 22-3303, the State was required to prove not only that he was charged with an off-grid crime but also that he was "likely to cause harm to self and others, as defined in subsection (f)(3) of K.S.A. 59-2946." Consequently, this argument is without merit.

Snyder also argues the State failed to prove he is mentally ill because his intellectual disability is a "developmental disorder" that does not qualify as a "mental illness." He points to the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition (DSM-5), which defines "neurodevelopmental disorders" to include intellectual disabilities. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 33 (5th ed. 2013). But, he fails to define "mental illness" for purposes of this argument. Indeed, it appears the DSM-5 does not even use the nomenclature "mental illness."

Regardless, the medical community's definitions of mental health concepts are not binding on the Legislature in this context. In *Hendricks*, the Supreme Court rejected a similar argument that a "mental abnormality" cannot be a "mental illness" for purposes of civil commitment because the term "mental abnormality" is "a term coined by the Kansas Legislature, rather than by the psychiatric community." 521 U.S. at 358-59. The Court held:

"Contrary to Hendricks' assertion, the term 'mental illness' is devoid of any talismanic significance. Not only do 'psychiatrists disagree widely and frequently on what constitutes mental illness,' *Ake v. Oklahoma,* 470 U.S. 68, 81 (1985), but the Court itself has used a variety of expressions to describe the mental condition of those properly subject to civil confinement. See, *e.g., Addington*, [441 U.S. at] 425-426 (using the terms 'emotionally disturbed' and 'mentally ill'); *Jackson v. Indiana,* 406 U.S. 715, 732, 737 (1972) (using the terms 'incompetency' and 'insanity'); cf. *Foucha,* 504 U.S., at 88 (O'CONNOR, J., concurring in part and concurring in judgment) (acknowledging State's authority to commit a person when there is 'some medical justification for doing so').

"Indeed, we have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, we have traditionally left to legislators the task of defining terms of a medical nature that have legal significance. Cf. *Jones v. United States,* 463 U.S. 354, 365, n. 13 (1983). As a consequence, the States have, over the years, developed numerous specialized terms to define mental health concepts. Often, those definitions do not fit precisely with the definitions employed by the medical community. The legal definitions of 'insanity' and 'competency,' for example, vary substantially from their psychiatric counterparts. See, *e.g.,* Gerard, The Usefulness of the Medical Model to the Legal System, 39 Rutgers L. Rev. 377, 391-394 (1987) (discussing differing purposes of legal system and the medical profession in recognizing mental illness). Legal definitions, however, which must 'take into account such issues as individual responsibility . . . and competency,' need not mirror those advanced by the medical profession. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders xxiii, xxvii (4th ed.1994)." 521 U.S. at 359.

As we explained in *In re Vanderblomen*, 264 Kan. 676, 681, 956 P.2d 1320 (1998): "We do not believe there is any reason to link the constitutionality of a statute to the changing tides of psychiatric thought as reflected in the most recent version of the DSM." Because the DSM is frequently revised, "it would be foolhardy to allow its altered provisions to render otherwise valid and comprehensible legislation unconstitutional." 264 Kan. at 681. Likewise, we decline to substitute the "changing tides" of the DSM for the statutory definitions here for purposes of proceedings under the Care and Treatment Act.

Indeed, Snyder does not contest the fact that according to the statutory definition applicable to him—K.S.A. 2017 Supp. 59-2946(e)—he is a "mentally ill person." The gravamen of Snyder's due process complaint is that in his view, involuntary commitment of a person who qualifies as a mentally ill person under Kansas law only because of an incurable disability is unconstitutional. The claim is essentially that such involuntary commitment can only be lawfully justified by treatment that has the potential to cure or improve a person's mental condition.

Applying this novel rule, Snyder argues the State cannot confine him because his intellectual disability cannot be cured or improved (calling it "untreatable"). For purposes of our analysis, we will assume Snyder's disability will permanently impair him to some degree, regardless of treatment. Even so, the question remains—does the Due Process Clause forbid the State from civilly committing an individual like Snyder whose mental condition cannot be cured or improved through treatment? The answer is no.

Snyder cites *O'Connor v. Donaldson*, 422 U.S. 563, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975), and *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982), for the proposition that the State must provide treatment that can cure or improve his disability. However, Snyder misapprehends the import of these decisions. In *O'Connor*, the Supreme Court expressly declined to address the issue, stating, "[T]here is

14

no reason now to decide whether mentally ill persons dangerous to themselves or to others have a right to treatment upon compulsory confinement by the State." 422 U.S. at 573. In *Youngberg*, the Court held that a severely mentally disabled person subject to civil commitment had the right to "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." 457 U.S. at 319. But, the *Youngberg* Court similarly declined to consider whether "a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training *per se*, even when no type or amount of training would lead to freedom." 457 U.S. at 318.

Instead, the Supreme Court has strongly indicated that a state may civilly commit an individual whose mental condition cannot be successfully treated. In *Hendricks*, the Court held the civil commitment of a sexually violent predator under the SVPA was nonpunitive even though his "mental abnormality" was untreatable. The Court emphasized that it had "never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others." 521 U.S. at 366. As the Court explained,

> "A State could hardly be seen as furthering a 'punitive' purpose by involuntarily confining persons afflicted with an untreatable, highly contagious disease. Accord, *Compagnie Francaise de Navigation a Vapeur v. Louisiana Bd. of Health,* 186 U.S. 380 (1902) (permitting involuntary quarantine of persons suffering from communicable diseases). Similarly, it would be of little value to require treatment as a precondition for civil confinement of the dangerously insane when no acceptable treatment existed. To conclude otherwise would obligate a State to release certain confined individuals who were both mentally ill and dangerous simply because they could not be successfully treated for their afflictions. Cf. *Greenwood v. United States,* 350 U.S. 366, 375 (1956) ('The fact that at present there may be little likelihood of recovery does not defeat federal power to make this initial commitment of the petitioner'); *O'Connor v. Donaldson,* 422 U.S. 563, 584 (1975) (Burger, C. J., concurring) ('[I]t remains a stubborn fact that there

15

are many forms of mental illness which are not understood, some which are untreatable in the sense that no effective therapy has yet been discovered for them, and that rates of "cure" are generally low')." 521 U.S. at 366.

See *Seling v. Young*, 531 U.S. 250, 262, 121 S. Ct. 727, 148 L. Ed. 2d 734 (2001) (In *Hendricks*, "We acknowledged that not all mental conditions were treatable. For those individuals with untreatable conditions, however, we explained that there was no federal constitutional bar to their civil confinement, because the State had an interest in protecting the public from dangerous individuals with treatable as well as untreatable conditions.").

Applying *Hendricks*, we hold the Due Process Clause does not obligate the State to release individuals from civil commitment who have been properly found to be mentally ill and dangerous "simply because they [can]not be successfully treated for their afflictions." 521 U.S. at 366. Accordingly, the fact that Snyder's intellectual disability cannot be cured or improved through treatment does not prevent the State from civilly committing him in accordance with other statutory and constitutional safeguards.

3. *The State presented sufficient evidence that Snyder is likely to cause harm to others.*

On appeal, Snyder also challenges the sufficiency of the evidence used to involuntarily commit him. Specifically, he argues the State did not present clear and convincing evidence that he is dangerous to himself or others. The State claims Zoglman's testimony provided sufficient evidence to support the lower court's findings that Snyder meets the "likely to cause harm" standard set forth in K.S.A. 2017 Supp. 59-2946(f)(3). We conclude the district court's finding was backed by substantial competent evidence and affirm.

When the sufficiency of the evidence is challenged, we do not "reweigh the evidence and will not disturb a lower court's factual findings when they are supported by substantial competent evidence." *Doug Garber Construction, Inc. v. King*, 305 Kan. 785, 791, 388 P.3d 78 (2017).

The State was required to prove by clear and convincing evidence that Snyder was "likely, in the reasonably foreseeable future, to cause substantial physical injury or physical abuse to self or others." K.S.A. 2017 Supp. 59-2946(f)(3). We conclude that Zoglman's testimony was sufficient to support the district court's finding that Snyder posed a danger to others. Zoglman reviewed the information contained in Snyder's competency file. She personally interviewed Snyder. She is a person with the necessary training and experience to opine on the likelihood and potential for future harm that may be caused by individuals with Snyder's diagnosis. She testified that Snyder was aware his charges were related to the sexual abuse of a child but believed they were not serious. As Zoglman summarized: "[D]ue to the severity of his charges and his lack of insight into the seriousness of his current legal situation, he is considered potentially dangerous to others without proper supervision." The district court was able to view and assess the credibility of the testimony of both Zoglman and Snyder.

Viewing the evidence in a light most favorable to the State, we hold the State presented sufficient evidence that Snyder was likely to "cause substantial physical injury or physical abuse" to others. K.S.A. 2017 Supp. 59-2946(f)(3). Though the evidence regarding Snyder's dangerousness was slim, it cleared the minimum threshold.

Lastly, Snyder raises two arguments that we decline to address today: (1) that his competency detainment violated due process under *Jackson*; and (2) that the long-term civil commitment of the intellectually disabled violates Section 1 of the Kansas Bill of Rights. The first argument is not within the scope of this appeal but is properly addressed in Snyder's habeas action this day decided. See *Snyder*, 307 Kan. ___. The second is not

17

preserved because Snyder raises it for the first time on appeal without invoking an exception to Kansas Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 34). See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015).

Finding no error, we affirm the order of Snyder's involuntary commitment.

Affirmed.